JUSTICE REGNIER
delivered the Opinion of the Court.
¶ 1 Somont Oil Company, Inc., Appellant/Cross-Respondent, filed suit against A & G Drilling, Inc., Cavalier Petroleum, Inc., A.G. Walls, also known as Joe Walls, John Walls, and Stewart Howell,'all doing business as C-W Joint Venture, also known as Cavalier-Walls Joint Venture, Respondents/Cross-Appellants (“C-W”), in the Ninth Judicial District Court, Toole County, to terminate certain oil and gas leases held by C-W. Following trial, the jury rendered a verdict in favor of CW. Somont appeals the judgment entered upon the jury verdict and certain pre-trial and post-trial rulings issued by the District Court. CW cross appeals the District Court’s award of attorney fees to Somont based on its determination that Somont had standing to prosecute this action. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.
¶2 The parties raise the following issues on appeal:
¶3 1. Did the District Court err when it concluded that Somont had standing to compel C-W’s release of certain oil and gas leases pursuant to § 82-1-202(1), MCA?
¶4 2. Did the District Court err when it allowed the jury to consider oil prices, economic considerations, and C-W’s financial condition in determining whether oil and gas leases had terminated due to a lack of production?
*225 BACKGROUND
¶5 In 1991, C-W purchased a number of oil and gas leases in the Kevin-Sunburst oil field in Toole County, Montana. Most of these leases were established in the 1920s for a specified number of years, i.e., the primary term. Consequently, the primary terms on these leases have long since expired. However, through various habendum clauses, the contracts provide for the leases’ extension of an indefinite secondary term. Pursuant to the habendum clauses, the lessee shall maintain a viable leasehold interest as long as the lessee produces oil and gas in paying quantities from said land. Therefore, following its 1991 purchase, C-W held its Kevin-Sunburst leasehold properties pursuant to the contingencies of the habendum clauses.
¶6 In late 1997, Somont offered to purchase a number of C-Ws Kevin-Sunburst leases. C-W subsequently declined Somont’s offer. Thereafter, on April 10, 1998, Somont informed C-W that it had acquired new leases from the Kevin-Sunburst lessors and that C-W’s leases had terminated due to a lack of production. Somont demanded that C-W execute lease releases on the properties. C-W refused to execute the releases and on May 20, 1998, Somont filed suit in the District Court to compel C-W’s execution of the releases. The District Court issued a temporary restraining order which precluded C-W from commencing any operations on the leasehold properties prior to a show cause hearing set for May 28, 1998.
¶7 Following the May 28, 1998, show cause hearing, the District Court determined that Somont had not acquired the lessors’ right to challenge or terminate C-W’s existing leases for failure of production. Therefore, the District Court denied Somont’s request for a preliminary injunction and vacated the temporary restraining order. Consequently, Somont obtained from the lessors an assignment of “any and all rights that [the lessors] may have to any and all claims and demands that any previous oil and gas lease on the subject property has expired, terminated or otherwise forfeited due to the cessation of production from the leased lands.” On June 12,1998, Somont filed an amended complaint referencing the assignments. Subsequently, C-W executed releases on twenty of its leases but refused to tender releases on eight of the Kevin-Sunburst leases. Therefore, the parties proceeded to trial on whether C-W’s eight remaining leases had terminated due to a cessation of production.
¶8 Prior to trial, the parties raised two issues which ultimately gave rise to this appeal. First, in opposing Somont’s motion for summary judgment, C-W insisted that Somont lacked standing to compel a *226 release on five of the eight leases because Somont maintained no ownership interest in those leases. C-W conceded that Somont had standing to prosecute the remaining three because Somont owned some portion of those leases’ mineral estate. The District Court denied Somont’s motion for summary judgment but concluded that Somont did have standing to challenge all eight leases.
¶9 Second, Somont filed a motion in limine with the District Court to exclude evidence of oil and gas prices as a justification for C-W’s lack of production. Further, Somont proposed a jury instruction which stated the jury could not consider oil prices, economic considerations, or C-W’s financial condition in determining whether the lack of production was justifiable as a temporary cessation. The District Court denied Somont’s motion in limine, in regard to the oil and gas prices, and rejected its proposed jury instruction. On May 11, 1999, the case proceeded to trial.
¶10 At trial, Somont presented evidence indicating a lack of production from the eight oil and gas leases during a specified period of time, the accounting period, prescribed by the District Court. C-W argued that the lack of production was justified as a temporary cessation. Therefore, C-W maintained that the temporary cessation of production doctrine prevented the leases’ termination. C-W presented evidence of reduced oil prices, a deflated economy, and the company’s financial pressures as justification for the cessation. After presentation of all of the evidence, the District Court denied Somont’s motion for judgment as a matter of law and instructed the jury to consider “all surrounding circumstances” in determining whether C-W’s leases had terminated for lack of production.
¶11 On May 14,1999, the jury rendered a special verdict in favor of CW. In so doing, the jury found that none of the eight leases terminated due to a lack of production. The jury also determined that Somont wrongfully interfered with C-W’s contractual and business relationships with the lessors and awarded C-W approximately $10,500 in damages. On May 21, 1999, the District Court entered judgment on the jury verdict and ordered that a hearing be held on June 4, 1999, to consider some remaining issues. On June 2, 1999, Somont renewed its motion for judgment as a matter of law and, in the alternative, moved for a new trial. The District Court denied both requests. On September 2,1999, in its final order and judgment on the miscellaneous issues, the District Court ordered C-W to pay $30,867.50 in attorney fees which Somont incurred in contesting C-W’s standing challenge on the twenty conceded leases. The District Court also *227 ordered Somont to pay $46,221.25 in attorney fees incurred by C-W in defending the action as it pertained to the eight leases.
¶12 On appeal, Somont argues the District Court erred in allowing the jury to consider oil prices, economic considerations, and C-W’s financial condition in determining whether the subject leases terminated due to a lack of production. Therefore, Somont appeals the District Court’s judgment on the jury verdict and order denying its motion for judgment as a matter of law. C-W cross-appeals on the issue of attorney fees, claiming Somont lacked standing to prosecute this action.
ISSUE ONE
¶13 Did the District Court err when it concluded that Somont had standing to compel C-W’s release of certain oil and gas leases pursuant to § 82-1-202(1), MCA?
¶14 A district court’s ruling on standing is a conclusion of law. Rieman v. Anderson (1997), 282 Mont. 139, 144, 935 P.2d 1122, 1125. The standard of review of a district court’s conclusions of law is whether the court’s interpretation of the law is correct. Carbon County v. Union Reserve Coal Co. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.
¶15 Of the eight leases contemplated herein, Somont owns a portion of three of the leases’ mineral estates. C-W concedes that Somont has standing to compel its release of those three oil and gas leases pursuant to § 82-1-202, MCA. However, C-W argues that Somont lacks standing to compel C-Ws release on the remaining five leases.
¶16 Section 82-1-202(1), MCA, provides:
If the lessee or assignee thereof neglects or refuses to execute a release as provided by this part, the owner of the leased premises may sue in any court of competent jurisdiction to obtain the release, and in such action he also may recover from the lessee, his successor, or assigns the sum of $100 as damages, all costs, together with a reasonable attorney’s fee for preparing and prosecuting the suit, and any additional damages that the evidence in the case warrants.
Prior to trial, the lessors of the five leases to which Somont owns no mineral estate assigned to Somont the right to sue C-W to compel CW’s release of its oil and gas leases. C-W insists that since Somont is not the owner of the leased premises, Somont lacks the requisite standing to compel C-W’s release pursuant to § 82-1-202, MCA.
¶17 Montana has long recognized the rule that rights arising from contracts between private individuals are assignable, and that non *228 assignability is the exception. Winslow v. Dundom (1912), 46 Mont. 71, 82, 125 P. 136, 139. In the absence of a non-assignable clause, either party may generally make an assignment of rights under the contract. Forsythe v. Elkins (1985), 216 Mont. 108, 113, 700 P.2d 596, 599-600. Further, all that is required to constitute a “real party in interest,” for purposes of Rule 17(a), M.R.Civ.P., is that the party be vested with legal title. Montana Ass’n of Credit Management v. Hergert (1979), 181 Mont. 442, 449, 593 P.2d 1059, 1063.
¶18 Each of the original leases in question is a contract which provides for the assignment of rights. One of the rights associated with the oil and gas leases is the right to compel termination of a lessee’s interest. While the assignment of rights provisions vary somewhat in language, the prevailing effect is that “the privilege of assigning [the estáte] in whole or in part is expressly allowed.” As rights arising from contracts are freely assignable and the assignment vested legal title in Somont, we hold that the District Court did not err in determining that Somont had standing to compel C-W’s release of the leases in question.
ISSUE TWO
¶19 Did the District Court err when it allowed the jury to consider oil prices, economic considerations, and C-W’s financial condition in determining whether oil and gas leases had terminated due to a lack of production?
¶20 A district court’s ruling on a motion in limine is an evidentiary ruling. Spinler v. Allen, 1999 MT 160, ¶ 29, 295 Mont. 139, ¶ 29, 983 P.2d 348, ¶ 29. A district court has broad discretion in determining whether evidence is relevant and admissible and we will not overturn its determination absent an abuse of that discretion. Spinier, ¶ 29.
¶21 Further, a district court has broad discretion regarding the instructions it gives or refuses to give to a jury. Schumacher v. Stephens, 1998 MT 58, ¶ 21, 288 Mont. 115, ¶ 21, 956 P.2d 76, ¶ 21. We will not reverse a district court on the basis of its instructions absent an abuse of that discretion. Schumacher, ¶ 21. When we examine whether particular jury instructions were properly given or refused, we must consider the instructions in their entirety and in connection with the other instructions given and with the evidence introduced at trial. Schumacher, ¶ 22. The party assigning error to the trial court’s instructions must show prejudice in order to prevail. Schumacher, ¶ 22. Prejudice will not be found if the jury instructions in their entirety state the applicable law of the case. Schumacher, ¶ 22.
¶22 Prior to trial, Somont filed a motion in limine seeking to *229 exclude evidence of oil and gas prices as a justification for C-W’s cessation of production. The District Court denied Somont’s motion in limine as it pertained to oil and gas prices. Soon thereafter, Somont submitted its proposed jury instructions to the District Court. Somont’s proposed instructions contained the following directives:
18. The fact that oil prices may be low; the cessation of production is for economic reasons or because the operators are in poor financial condition cannot form the basis for a justifiable temporary cessation of production.
19. Poor condition of the oil market and/or low quality of oil although rendering the well unprofitable to operate does not prevent an automatic termination of the lease when production ceases.
The District Court rejected the above proposed instructions and instead instructed the jury as follows:
16. A lease continues in existence so long as interruption of production in paying quantities does not extend for a period longer than reasonable or justifiable in light of all the circumstances involved.
17. A lease is not terminated for failure to produce the moment production stops, nor does it terminate the instant production falls below a profitable level. All surrounding circumstances must be taken into consideration before cancellation may be decreed.
Therefore, the jury was allowed to consider testimony regarding fluctuations in oil prices, economic concerns, and C-W’s financial instability in determining whether C-W’s lack of production was justified.
¶23 Somont argues that the District Court abused its discretion when it denied Somont’s motion in limine and failed to exclude oil and gas prices, economic factors, and C-W’s financial condition from the jury’s consideration. Somont contends that this abuse in discretion sufficiently prejudiced Somont to warrant a reversal of the District Court’s judgment upon the jury verdict. We agree.
¶24 All of the oil and gas leases subject to this litigation contain a habendum clause fixing the ultimate duration of the lessee’s interest. Oil and gas habendum clauses generally consist of two parts, the primary term, which establishes a definite period, and the secondary term which is of indefinite duration. Robert E. Sullivan, Handbook of Oil and Gas Law § 40 (1955). The clause obligates the lessee to maintain production on the premises and pay a royalty to the lessor. The clause also provides that if the lessee fails to produce oil and gas *230 within the primary term, the lease will automatically terminate at the end of the primary term. If the lessee maintains production throughout the primary term, the lease will terminate thereafter upon the cessation of production. See McCullough Oil, Inc. v. Rezek (W. Va. 1986), 346 S.E.2d 788, 793.
¶25 Once the lease transitions into the secondary term, jurisdictions vary as to what circumstances will precipitate termination of the lease upon the cessation of production. This jurisdictional dichotomy has been described as follows:
In a number of the producing states the courts treat termination of a lease as involving a cancellation or forfeiture in equity. In these states where production has ceased or is no longer deemed to be in paying quantities, cancellation of the lease will not be decreed where, in view of relevant circumstances, such decree would be unreasonable.
In Texas and several other jurisdictions termination of a lease under the habendum clause is treated as a determinable limitation on the lessee’s estate. A cessation of production results in automatic termination except in those cases where the cessation is deemed ‘temporary.’
Richard W. Hemingway, Law of Oil and Gas § 6.4(B) (3d ed. 1991).
¶26 Montana is an ownership-in-place state with regard to oil, gas and other minerals. Voyta v. Clonts (1958), 134 Mont. 156, 162, 328 P.2d 655, 659. Essentially, this means oil and gas leases transfer to the lessee a fee simple determinable estate with the lessor retaining a possibility of reverter. See Krutzfeld v. Stevenson (1930), 86 Mont. 463, 476-77, 284 P. 553, 556. Therefore, upon the occurrence of a stated event, the lessee’s interest automatically terminates. See Berthelote v. Loy Oil Co. (1933), 95 Mont. 434, 447, 28 P.2d 187, 191. Here, as in most oil and gas leases operating pursuant to the conditions of the secondary term, the event triggering automatic termination is the cessation of production in paying quantities. See Berthelote, 95 Mont. at 448, 28 P.2d at 191.
¶27 This Court has defined paying quantities as the amount of production which would pay a small profit over the cost of operation of the well, excluding from consideration the initial cost of bringing the well into production. Berthelote, 95 Mont. at 448, 28 P.2d at 191. Therefore, by paying quantities’ very definition, the finder of fact must necessarily consider income generated from the property and the expenses incurred in its operation, thus implicating economic influences. See Eugene Kuntz, Oil and Gas § 26.7(d) (1987). In *231 Christian v. A.A. Oil Corp. (1973), 161 Mont. 420, 506 P.2d 1369, this Court articulated the test to determine whether production in paying quantities has ceased. We stated:
The test for determining whether there was sufficient production or whether the lessee was acting with reasonable diligence in producing and marketing the gas from the leased lands is the diligence which would be exercised by the ordinary prudent operator having regard to the interests of both lessor and lessee. This is a question of fact that will depend upon the facts and circumstances of each case.
Christian, 161 Mont. at 427-28, 506 P.2d at 1373 (citations omitted). Thus, an oil and gas lease which fails to produce in paying quantities terminates upon cessation.
¶28 However, in an effort to mitigate against the harshness of the automatic termination rule, courts developed the temporary cessation of production doctrine. Pursuant to this doctrine, once a plaintiff establishes that an oil and gas lease has halted production, the burden shifts to the defendant to prove that the cessation was temporary and not permanent. See Eichman v. Leavell Resources Corp. (Kan. Ct. App. 1994), 876 P.2d 171, 174. A temporary cessation in production will not trigger an automatic termination of the lease as contemplated in the habendum clause. Kuntz, § 26.8(d). There is some dispute between Somont, C-W, and Amicus Curiae as to whether Montana has adopted the temporary cessation of production doctrine, and, if so, to what extent. Therefore, to clarify any ambiguity, we hereby adopt the temporary cessation of production doctrine as it applies to the oil and gas arena.
¶29 Most jurisdictions, in determining whether a cessation of production is temporary or permanent, consider the cause of the cessation, the time reasonably required to restore production, and the diligence exercised by the lessee in restoring production. Kuntz, § 26.8(e). What constitutes a reasonable time and diligence will depend on the particular facts presented. See Cobb v. Natural Gas Pipeline Co. of Am. (5th Cir. 1990), 897 F.2d 1307, 1309. However, jurisdictions vary significantly on which causes contributing to the cessation may be considered in the temporary cessation of production analysis. Those jurisdictions which treat termination as a cancellation or forfeiture in equity generally hold that “the lease continues in force unless the period of cessation, viewed in the light of all the circumstances, is for an unreasonable time.” See, e.g., Cotner v. Warren (Okla. 1958), 330 P.2d 217, 219 (emphasis added). Conversely, ownership-in-place *232 jurisdictions generally limit temporary cessations to mechanical or production breakdowns. See Hemingway, § 6.4(B).
¶30 Here, Somont established at trial that the leases failed to produce in paying quantities during the accounting period prescribed by the District Court. At that point the Christian analysis, implicating economic factors, concluded. In turn, C-W asserted that the failure to produce in paying quantities was justified as a temporary cessation. The parties argued to the District Court the circumstances which the finder of fact may consider in evaluating whether the cessation was temporary. The District Court agreed with C-W that the jury should consider “all surrounding circumstances,” which, in this case, included oil prices, economic concerns, and C-W’s financial condition. Somont insists the District Court erred in its ruling and urges this Court to follow other ownership-in-place jurisdictions’ treatment of the temporary cessation of production doctrine. Texas is one such ownership-in-place jurisdiction and we are inclined to follow its lead on this issue.
¶31 In Watson v. Rochmill (Tex. 1941), 155 S.W.2d 783, the lessee of an oil and gas lease ceased oil production due to the depressed market for low gravity oil. The lessor filed suit for a judgment declaring the lease terminated. The lessee insisted that the temporary cessation of production doctrine precluded termination of the lease. The Supreme Court of Texas concluded that to prevent termination of the lease pursuant to the temporary cessation of production doctrine, the cessation must be “due toja] sudden stoppage of the well or some mechanical breakdown of the equipment used in connection therewith, or the like.” Watson, 155 S.W.2d at 784. Therefore, the court held that the lease had terminated because the oil market did not prevent operation of the well. Watson, 155 S.W.2d at 784.
¶32 Adopting Texas’s narrow temporary cessation of production test comports with the principles in Montana that: (1) oil and gas leases are to be construed liberally in favor of the lessor and strictly against the lessee; and (2) while forfeitures are usually not favored in the law, due to the peculiar nature of oil and gas leases, forfeitures are here favored.[1] Christian, 161 Mont. at 425, 506 P.2d 1369. Further, Texas’s temporary cessation of production standard properly balances the interests of the lessor and lessee. The diligent lessee who takes *233 immediate steps to rectify a sudden halt in production will not lose his or her investment. Similarly, a lessee’s self-serving voluntary cessation will not subordinate the lessor’s interest in generating income via production. See Bruce M. Kramer, The Temporary Cessation Doctrine: A Practical Response to an Ideological Dilemma, 43 Baylor L. Rev. 519, 549 (1991).
¶33 In summary, actions commenced to terminate oil and gas leases invoke two distinct inquiries: (1) Is the lease producing in paying quantities?; and (2) If not, was the cessation in production permanent or temporary? As to production in paying quantities, economic considerations are absolutely relevant. However, those very economic considerations should not factor into the temporary versus permanent cessation analysis. A cessation in production will only be deemed temporary when it is caused by a sudden stoppage of the well or a mechanical breakdown of the equipment used in connection with the well, or the like.
¶34 We disagree with Justice Trieweiler’s characterization of Stimson v. Tarrant (9th Cir. 1943), 132 F.2d 363. It is true that, in Stimson, the Ninth Circuit declined to terminate an oil lease when the well ceased production due to the lack of market. However, the analysis in Stimson focused solely on the first prong of the two-part test articulated above. In effect, the Ninth Circuit held that a genuine lack of market will not compel termination of an oil lease when the well is fully capable of producing in paying quantities. In other words, if there is a lack of market; if the lease is capable of producing in paying quantities; and if the lessee is using reasonable diligence to market the product, Montana law will deem the lease as one which is “producing in paying quantities” and never reach the temporary cessation of production issue.
¶35 The concepts discussed in Stimson were later reiterated in Christian, as alluded above. Our holding today has done nothing to disturb the principles discussed in Stimson and Christian. The equitable notions contemplated therein remain valid considerations but apply only to the “producing in paying quantities” prong of the two-part test. Once it is determined that a lease is not producing in paying quantities, the analysis shifts to the temporary cessation of production prong where the equitable principles no longer factor into the equation. As such, the specific evidence referenced by Justice Cotter maintains no relevance to the inquiry implicated herein and the jury should not have been instructed to consider it.
¶36 Accordingly, we hold that the District Court abused its *234 discretion in allowing the jury to consider oil prices, economic considerations, and C-W’s financial condition in determining whether C-W’s cessation was justified as temporary. Further, the District Court’s abuse in discretion sufficiently prejudiced Somont to warrant a new trial.
¶37 Somont insists it is entitled to judgment as a matter of law. Somont urges this Court to remand the matter to the District Court for an entry of judgment in favor of Somont. We decline to do so.
¶38 The standard of review in appeals from a judgment notwithstanding the verdict made pursuant to Rule 50(b), M.R.Civ.P., is the same as that for review of a motion for a directed verdict, and a directed verdict may be granted only where it appears as a matter of law that a party could not prevail upon any view of the evidence including the legitimate inferences to be drawn therefrom. Ryan v. City of Bozeman (1996), 279 Mont. 507, 510, 928 P.2d 228, 229. An implicit precursor to the “any view of the evidence” language is the requisite presentation of evidence. Here, C-W presented its evidence under a misinformed standard. C-W has not yet had an opportunity to present its evidence in accordance with the temporary cessation of production factors adopted herein. It would be premature to say that C-W cannot prevail on any view of the evidence. Therefore, we decline Somont’s invitation to remand this case for an entry of judgment in its favor.
¶39 Finally, following the jury verdict, the District Court awarded attorney fees in the amount of $30,867.50 to Somont and $46,221.25 to C-W pursuant to § 82-1-202(1), MCA. Section 82-1-202(1), MCA, does permit the prevailing party to recover reasonable attorney fees incurred in prosecuting or defending the action. However, in light of our holding, the District Court will have to reconsider the attorney fee issue following the disposition of this case on remand.
¶40 Reversed and remanded for a new trial.
CHIEF JUSTICE GRAY, JUSTICES LEAPHART and RICE and DISTRICT COURT JUDGE SIMONTON sitting for JUSTICE NELSON concur.

 While the “forfeiture” terminology is semantically incorrect for ownership-in-place jurisdictions, the principle espoused in the statement remains sound in Montana jurisprudence.