No. 01-546

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 117

STATE OF MONTANA

    Plaintiff and Respondent,

  v.

BRYAN TRENT WELDELE,

    Defendant and Appellant.


APPEAL FROM:    District Court of the First Judicial District,
                In and for the County of Lewis and Clark, Cause No. ADC-2000-42
                The Honorable Dorothy McCarter, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

        Wendy Holton, Helena, Montana

        For Respondent:

        Mike McGrath, Montana Attorney General, Pamela D. Bucy, Assistant
        Montana Attorney General, Helena, Montana; Leo J. Gallagher, Lewis and
        Clark County Attorney, Mike Menahan, Deputy Lewis and Clark County
        Attorney, Helena, Montana


                                        Heard:  April 29, 2002
                                     Submitted: May 14, 2002
                                       Decided:  April 29, 2003

Filed:



_____
                Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1      Bryan Weldele (Weldele) was convicted of felony driving under the influence (DUI)

and assault on a minor.  He raises eight issues on appeal.  We affirm.

## ISSUES

¶2      Weldele challenged several aspects of the District Court's ruling.  The restatement of

the issues presented to this Court is:

        1.      Did the District Court err when it denied Weldele's motion to dismiss after finding that Weldele knowingly and intelligently waived his right to counsel when he pled guilty to DUI in Oregon in 1987?

        2.      Did the District Court err when it denied Weldele's motion to dismiss and subsequently used Weldele's 1984 and 1987 DUI guilty pleas to raise his 2000 DUI offense to a felony despite a law in effect between 1981 and 1989 that required expungement, under certain circumstances, of DUIs after five years?

        3.      Does the decision of the United States Supreme Court in *Apprendi v. New Jersey* preclude enhancing punishment based on factors that have not been charged and proved beyond reasonable doubt?

        4.      Did the District Court erroneously deny Weldele's motion in limine to preclude the use of the results of the breath tests at trial on the basis that the State had failed to provide full discovery regarding these tests?

        5.      Did the District Court erroneously deny Weldele's motion in limine to preclude the use of the results of the preliminary breath test (PBT), a/k/a preliminary alcohol screening test (PAST), at trial?

        6.      Did the District Court err when it denied various motions filed by Weldele at the pretrial conference as untimely?

        7.      Was Weldele's counsel ineffective for failing to file the denied motions in a timely manner?

        8.      Did the District Court err in refusing to grant a mistrial when a witness

2

repeatedly referred to alleged prior bad acts by Weldele?

¶3    We address each of these issues below.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4    Weldele and Susan Sheridan (Sheridan), who had been dating for several months, drove to Sheridan's Helena residence on the evening of February 14, 2000, after completing some errands.  Sheridan alleges that Weldele was angry with her when they returned.  They had been drinking and according to Sheridan, Weldele was drinking heavily and quickly.  Sheridan asserts that Weldele became verbally abusive to her ten-year old daughter, J.B.[1], and was "tormenting" and physically "fighting" with J.B., while Weldele characterizes the event as one of "horseplay" between him and J.B.  During this incident between Weldele and J.B., Weldele was struck in the eye by J.B.'s finger or by a pencil that J.B. had been holding.  Sheridan claims that Weldele responded by grabbing J.B. by the hair and dragging her across the room and that this was done with enough force to pull out some of J.B.'s hair.   When Sheridan attempted to intervene, she claims Weldele grabbed her by her hair as well.  Sheridan immediately told Weldele to leave which he did. Sheridan thereafter called the police.  Sheridan reported that Weldele had assaulted her daughter and her, that he had left her residence, presumably en route to his own, and that he was driving while possibly intoxicated.

¶5    Deputy Sheriff Ken Goetz and Sergeant Dirk Anderson of the Lewis and Clark Sheriff's Department were dispatched separately in response to Sheridan's call.  Goetz

---

[1] To protect the identity of the minor in this case, we shall refer to her by initials only.

observed Weldele traveling toward his residence on I-15 northbound just south of the Lincoln Road interchange. Goetz pursued Weldele and overtook him as Weldele pulled into a grocery store parking lot on Lincoln Road. Goetz activated his emergency lights, pulled in and parked behind Weldele's vehicle. The deputy approached Weldele and advised him that he was investigating a reported assault. Goetz noted that Weldele appeared "unsteady on his feet," and was weaving while standing and walking. Goetz also noticed that Weldele's motor skills seemed impaired and his speech was slurred. In response to Goetz's question, Weldele said he had a few beers and that he "had committed a little domestic violence tonight." He also told Goetz that he had perhaps been a "little rough on [J.B.]." Based on his observations, Goetz asked Weldele if he would perform some field sobriety tests. Weldele agreed. Weldele subsequently attempted to perform the one-legged stand and the walk and turn tests. According to Goetz, Weldele either failed these tests or performed them poorly.

¶6     After waiting the prescribed observation period and advising Weldele of his rights vis-a-vis the PBT, Goetz administered the field PBT to Weldele with Weldele's permission. Weldele's PBT indicated an estimated breath alcohol concentration (BAC) of .154. Goetz thereafter arrested Weldele for DUI.

¶7     Most of this investigation was videotaped by Officer Joseph Cohenour of the Montana Highway Patrol. Cohenour had heard the dispatcher, offered his assistance and arrived on the scene approximately two minutes after Goetz. He immediately positioned his vehicle and activated his patrol car's video camera. The camera proceeded to videotape Weldele as

4

he took the field sobriety tests. Additionally, Cohenour spoke with Weldele and he too observed that Weldele smelled of alcohol, slurred his words and was unsteady on his feet.

¶8 While Goetz was in the field with Weldele, Anderson was interviewing Sheridan and J.B. at the Sheridan residence. Based upon these interviews, Anderson notified Goetz that Weldele should also be arrested for partner assault against Sheridan and assault on a minor.

¶9 Goetz transported Weldele to the detention center where Weldele once again performed the one-legged stand and walk and turn tests. Additionally, he consented to and took the Intoxilizer breath analysis test. The result of the Intoxilizer test was .171.

¶10 Weldele was charged by Information on February 18, 2000, with felony DUI, driving without valid insurance (subsequently dropped), partner assault, and assault on a minor. The DUI charge was enhanced to a felony based on three previous DUI convictions on Weldele's record, occurring in October 1984, October 1987, and March 1991. After multiple continuances of his trial date, Weldele's jury trial was scheduled for November 13-14, 2000. At his November 1st pretrial conference, Weldele submitted a motion in limine and a motion to suppress evidence, both of which were denied by the District Court as untimely.

¶11 During trial, Sheridan made several references to an alleged prior domestic assault by Weldele even though a motion in limine excluding mention of prior bad acts had been granted. Following Sheridan's testimony, Weldele's counsel moved for a mistrial based upon these prior bad act references. The motion was denied but a curative jury instruction was delivered. Ultimately, the jury found Weldele not guilty of partner assault against Sheridan and guilty of felony DUI and assault on a minor. He was subsequently sentenced to house

5

arrest for six months, followed by three years probation for the DUI charge and one year suspended, subject to specific conditions, for the assault charge. Additionally, Weldele was required to pay certain surcharges and a $1,000 fine. Weldele filed a timely appeal.

## DISCUSSION

*The enhancement of Weldele's DUI to felony status*

¶12    Weldele challenges the enhancement of his February 14, 2000 DUI charge to a felony DUI on three separate grounds: 1) he did not knowingly waive his right to counsel for his 1987 DUI charge; 2) the law in effect at the time he pled guilty to two previous DUIs in 1984 and 1987 stated that those offenses would be expunged from his record after five years; and 3) under *Apprendi,* prior offenses not included in the charging document or proved beyond a reasonable doubt cannot be used to enhance his DUI charge.

¶13    The first issue we address is whether the District Court erred when it denied Weldele's motion to dismiss after finding that Weldele knowingly and intelligently waived his right to counsel when he pled guilty to DUI in Oregon in 1987. The grant or denial of a motion to dismiss in a criminal case is a question of law which we review *de novo* on appeal. Our standard of review is plenary, and we determine whether a district court's conclusion is correct. *State v. Hardaway*, 2001 MT 252, 307 Mont. 139, 36 P.3d 900 (citation omitted).

¶14    Weldele was arrested and charged with DUI in La Grande, Oregon, on September 29, 1987. He appeared before District Court Judge Eric Valentine on October 12, 1987, and pled guilty to the charge. Weldele asserts that he was not represented by an attorney nor does he recall being told that he had the right to an attorney and that an attorney would be

6

appointed to represent him if he could not afford one.

¶15　The Sixth Amendment of the United States Constitution, and Article II, Section 24, of the Montana Constitution guarantee the fundamental right to the assistance of counsel. *Gideon v. Wainwright* (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799; *State v. Okland*, (1997), 283 Mont. 10, 14, 941 P.2d 431, 433.　However, a defendant may waive this fundamental right if he or she does so specifically, voluntarily, and knowingly.　*State v. Howard*, 2002 MT 276, ¶ 12, 312 Mont. 359, ¶ 12, 59 P.3d 1075, ¶ 12 (citations omitted).

¶16　While it is well established that the State may not use a constitutionally infirm conviction to support an enhanced punishment, such as a felony DUI, there is a rebuttable presumption of regularity that attaches to prior criminal convictions, including prior DUI convictions.　*Howard*, ¶ 10.　*See also State v. Peterson*, 2002 MT 65, ¶ 6, 309 Mont. 199, ¶ 6, 44 P.3d 499, ¶ 6 (citation omitted) (A presumption of regularity, including the presumption that a defendant was properly informed of and waived any constitutional rights at issue, attaches to a prior DUI conviction used to enhance a subsequent conviction to a felony).　This presumption may be overcome, however, by direct evidence of irregularity from the defendant.　*Peterson*, ¶ 6 (*citing State v. Big Hair*, 1998 MT 61, ¶ 16, 288 Mont. 135, ¶ 16, 955 P.2d 1352, ¶ 16).　Once the defendant has presented evidence of irregularity, the burden then shifts to the State to prove by a preponderance of evidence that the prior conviction was not obtained in violation of the defendant's rights.　*Peterson*, ¶ 6 (*citing State v. Ailport*, 1998 MT 315, ¶ 7, 292 Mont. 172, ¶ 7, 970 P.2d 1044, ¶ 7).

¶17　As indicated above, a rebuttable presumption of regularity attaches to Weldele's 1987

DUI conviction; however, Weldele may overcome this presumption by direct evidence of irregularity. By way of direct evidence, Weldele submitted an affidavit in which he claimed that when he pled guilty to the charge in Oregon, he did not recall being told that he had the right to an attorney and that an attorney would be appointed to represent him if he could not afford one. However, Weldele's equivocal recollection is at a variance with the transcript of Weldele's 1987 audio-taped arraignment before Judge Valentine, which reveals the following colloquy:

Judge Valentine: You have the right to remain silent. The right to a trial by jury. The right to have an attorney represent you. And if you cannot afford an attorney to have one appointed free. Do you understand those rights?

Weldele: Yes.

. . .

Judge Valentine: . . . Are you going to want to see an attorney?

Weldele: No.

¶18     In addition to the arraignment transcript unequivocally demonstrating that Weldele was told of his rights, Judge Valentine submitted an affidavit stating that he had advised Weldele of his constitutional rights.

¶19     As to Weldele's claim that under *Faretta v. California* (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562, he also should have been advised of the dangers and disadvantages of self-representation in order for his waiver to be knowing, voluntary and intelligent, we note that it is not within this Court's jurisdiction to determine whether the Oregon court correctly applied or failed to apply *Faretta.*

8

¶20 Based on the foregoing, we conclude the District Court did not err in denying Weldele's motion to dismiss his felony DUI on the grounds that Weldele had not knowingly and voluntarily waived his right to counsel prior to pleading guilty to Oregon DUI charges in 1987.

¶21 We next consider whether the District Court erred when it denied Weldele's motion to dismiss and subsequently used Weldele's 1984 and 1987 DUI guilty pleas to raise his 2000 DUI offense to a felony, despite the existence of a law in effect between 1981 and 1989 that required expungement, under certain circumstances, of DUIs after five years.

¶22 Weldele has been charged with four DUIs. His first DUI charge was on October 2, 1984, and he was convicted on October 15, 1984. He was charged with his second DUI on September 29, 1987, and convicted on October 12, 1987. He was charged with his third DUI on September 29, 1990, and convicted on March 15, 1991. He was charged with his fourth DUI on February 14, 2000. Weldele argues that because the law in effect at the time of his 1984 and 1987 DUIs provided that those DUI charges could not be used against him after five years, those DUIs should not have been counted as previous convictions and used to enhance the DUI in the case at bar to a felony. Section 61-8-714(5), MCA, in effect from 1981 through September 30, 1989, read as follows:

> For the purpose of determining the number of convictions under this section, . . . . An offender is considered to have been previously convicted for the purposes of this section if less than 5 years have elapsed between the commission of the present offense and a previous conviction. If there has been no additional conviction for an offense under this section for a period of 5 years after a prior conviction hereunder, then such prior offense shall be expunged from the defendant's record.

9

¶23 Weldele argues that because more than five years have elapsed between any of his prior convictions and the present offense, his 1984 and 1987 convictions cannot be used against him. Weldele misinterprets the statute on which he relies.

¶24 Section 61-8-714(5), MCA, recited above, was in effect at the time Weldele was convicted of both the 1984 and 1987 DUIs. Because Weldele's 1987 DUI conviction followed his 1984 conviction by only three years, his 1984 DUI was not expunged, ceased to qualify for expungement and remains on his record. *State v. Thibert*, 1998 MT 207, ¶ 10, 290 Mont. 408, ¶ 10, 965 P.2d 251, ¶ 10. For the same reason, Weldele's 1987 DUI conviction remains on his record as a result of his 1990/1991 DUI and conviction.

¶25 Subsequently, § 61-8-714(5), MCA, was amended, effective October 1, 1989. This version reads as follows:

> For the purpose of determining the number of convictions under this section, . . . . An offender is considered to have been previously convicted for the purposes of this section if less than 5 years have elapsed between the commission of the present offense and a previous conviction. If there has been no additional conviction for an offense under this section for a period of 5 years after a prior conviction hereunder, then all records and data relating to the prior conviction are confidential criminal justice information . . . and public access to the information may only be obtained by district court order upon good cause shown.

¶26 This version of the law was in effect at the time Weldele committed his 1990 DUI and at the time he was convicted of it in March 1991. This statute informs Weldele that if he remains DUI-conviction-free for five years from the time of his 1990 conviction, the 1990 conviction will not be expunged but will become confidential criminal justice information. The distinction between expungement and confidential classification is significant. *State v.*

*Brander* (1996), 280 Mont. 148, 156, 930 P.2d 31, 36. An expunged conviction may not be used for calculating penalties for subsequent DUIs, whereas confidential criminal justice information is available for review by a court. *Brander*, 280 Mont. at 156, 930 P.2d at 36. "Therefore, while a court cannot review expunged records because those records effectively do not exist, a court is in no way restricted from reviewing criminal records simply because those records are classified as confidential." *Brander*, 280 Mont. at 156, 930 P.2d at 36. *See also* § 44-5-303, MCA (1999). Thus, at this stage in Weldele's DUI-history, he had two DUIs that would remain on his record permanently, and one that could qualify for confidentiality but would still be available for court review.

¶27   In 1995, the Montana Legislature again amended § 61-8-714, MCA, by adding a new subsection which provides for a felony sanction for offenders on a fourth or subsequent DUI conviction. Section 61-8-714(4), MCA (1995). In conjunction with this new subsection of the statute, the Legislature amended § 61-8-714(6), MCA (formerly subsection (5)), to provide, in pertinent part, as follows:

> An offender is considered to have been previously convicted for the purposes of sentencing if less than 5 years have elapsed between the commission of the present offense and a previous conviction, **unless the offense is the offender's fourth or subsequent offense, in which case all previous convictions must be used for sentencing** purposes. . . . (Emphasis provided.)

¶28   Therefore, as of 1995, Weldele was on notice that a fourth DUI qualified as a felony and that all of his previous DUI convictions would be counted for sentencing purposes.

¶29   The Legislature dramatically revised the DUI statutory scheme in 1997 by creating separate misdemeanor DUI statutes and felony DUI statutes. Section 61-8-714, MCA,

11

became the misdemeanor statute establishing the penalty for the first through third DUI offenses. As a result, § 61-8-714, MCA, no longer included language referencing a fourth offense or sentencing for fourth or subsequent offenses. That language was moved to the felony DUI statutes. Section 61-8-731, MCA (1997), created the penalty applicable to felony DUIs, *i.e.*, fourth or subsequent DUI offenses, and § 61-8-734(b), MCA, adopted the language formerly found in § 61-8-714(6), MCA, informing prospective DUI defendants that after the fourth DUI all previous DUIs would be used for sentencing purposes.

¶30     The new DUI statutory scheme, separating felony DUI from misdemeanor DUI, became effective on October 1, 1997, and expressly applied to offenses committed on or after October 1, 1997. This version of the law was in effect at the time Weldele committed his February 2000 DUI. As did the 1995 statute, this law once again notified Weldele that with a fourth DUI offense, all previous DUI convictions would be counted for sentencing purposes.

¶31     Weldele argues that "fundamental fairness" dictates that the State not go back on its word to Weldele that his 1984 and 1987 convictions would not be used against him. Had Weldele managed to comply with the law in effect at the time he entered his 1984 guilty plea and not committed a subsequent DUI within five years of his 1984 conviction, the law would have "kept its word" and expunged the 1984 conviction. Likewise, had Weldele postponed his third DUI until after October 12, 1992, the State would have once again "kept its word" and expunged his 1987 conviction. However, as forbearance did not prevail, both Weldele's 1984 and 1987 DUI convictions did not qualify for expungement and remain on his record.

¶32    Thus, there is no "fundamental fairness," due process, or *ex post facto* issue in this case.   The accurate and lawful application of the laws in effect at the time Weldele committed and was convicted of each of his multiple DUIs allows for the enhancement of his sentence based upon his complete DUI record of four offenses.  Thus, the District Court did not err in denying Weldele's motion to dismiss.

¶33    Does the decision of the United States Supreme Court in *Apprendi* preclude the enhancement of Weldele's punishment based on factors that have not been charged and proved beyond reasonable doubt?

¶34    The District Court's determination of whether *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, was applicable to the case at bar is a conclusion of law and will be reviewed by this Court for correctness.  We take into account the fact that the District Court imposed a sentence, in part, based upon the inapplicability of *Apprendi*. We review the District Court's sentence of Weldele for legality.  Because we are reviewing a legal conclusion and the application of sentencing guidelines, our review is *de novo*.  *State v. Kaufmann,* 2002 MT 294, ¶ 12, 313 Mont. 1, ¶ 12, 59 P.3d 1166, ¶ 12.  *See also U.S. v. Martin* (9th Cir. 2002), 278 F.3d 988, 1005 (citation omitted).

¶35    *Apprendi* was decided by the U.S. Supreme Court on June 26, 2000.  Neither party referenced it in any pretrial motions nor was its applicability mentioned during the November 2000 trial.  In February 2001, Weldele submitted a Sentencing Memorandum which included, for the first time, his *Apprendi* argument.  Relying on *Apprendi*, Weldele argued that the District Court could not enhance his DUI to a felony DUI because the State

13

had failed to charge and prove, beyond a reasonable doubt, prior convictions that it intended to use to increase the penalty for a driving under the influence offense.

¶36    On April 2, 2001, the District Court issued its Judgment, in which it made no reference to *Apprendi*.  The court sentenced Weldele to six months house arrest for felony DUI, followed by three years probation.  He was fined $1,000.  Under § 61-8-731, MCA (1999), the penalty for felony DUI is no less than six months nor more than thirteen months imprisonment; no less than one year nor more than four years probation, and a fine of no less than $1,000 nor more than $10,000. We note that Weldele's sentence is within the range of felony DUI sentences available under § 61-8-731, MCA (1999). Weldele argues that his case should be remanded for sentencing as a first offense DUI because the State failed to comply with the rule set out in *Apprendi.*  Weldele's reliance on *Apprendi* is misplaced.

¶37    First, we note that *Apprendi* contains the following express language:

> [O]ur reexamination of our cases in this area, and of the history upon which they rely, confirms the opinion that we expressed in *Jones*.  **Other than the fact of a prior conviction**, any fact that **increases the penalty for a crime beyond the prescribed statutory maximum** must be submitted to a jury, and proved beyond a reasonable doubt. (Emphasis added.)

*Apprendi*, 530 U.S. at 490.   Here, it was the prior convictions <u>alone</u> that led to Weldele's enhanced penalty.  Clearly, under *Apprendi*, the fact of a prior conviction need not be submitted to the jury, or proven beyond a reasonable doubt.

¶38     Second, in *Apprendi*, Apprendi was charged with, indicted for and pled guilty to weapons offenses.  Subsequently, the judge determined that Apprendi had also violated the State's "hate crime" statute.  The judge then applied the "hate crime" sentence enhancement

14

statute and sentenced Apprendi to a sentence that exceeded the statutory maximum for the weapons offenses. Significantly, he was never charged with violation of the hate crime statute nor did a jury find him guilty of it. The Supreme Court concluded that Apprendi's sentence violated his right to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt" (*Apprendi*, 530 U.S. at 477) and that such right attached not only to his weapons offense but also to the "hate crime" aggravating circumstance. Additionally, the Supreme Court explained that the Sixth Amendment does not permit a defendant to be "expose[d] . . . to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Apprendi,* 530 U.S. at 483 (emphasis in original).

¶39    In the case at bar, Weldele was charged with felony DUI in accordance with statutes that had been in effect for several years. The jury found him guilty of the offense for which he was charged and the judge imposed a sentence which was within the range of statutorily-authorized sentences for that offense. The judge, subsequent to the jury's verdict, did not find Weldele guilty of another offense for which he had not been charged, nor did he impose a sentence on Weldele that surpassed the maximum allowed sentence for the offense for which the jury had found him guilty.

¶40    For the foregoing reasons, we conclude the District Court did not err in declining to apply the *Apprendi* holding to Weldele's case.

*The denial of Weldele's motion in limine to preclude admission of PBT/PAST results at trial*

¶41    We next consider whether the District Court erred in denying Weldele's motion in

15

limine to preclude the use of the results of the breath tests at trial, on the basis that the State had failed to provide full discovery regarding these tests. We have held that a district court's ruling on a motion in limine is an evidentiary ruling and that the court has broad discretion in determining whether evidence is relevant and admissible. As such, this Court will not overturn a district court's determination absent an abuse of that discretion. *Somont Oil Co., Inc. v. A & G Drilling*, 2002 MT 141, 310 Mont. 221, 49 P.3d 598 (citation omitted).

¶42    Litigating parties are entitled to seek relevant information from one other through the process of discovery. Rule 26, M.R.Civ.P. In the case at bar, Weldele sought to have the State produce an extensive array of documents that would confirm that the breath testing devices used to establish Weldele's BAC were certified, operated, maintained and stored in a manner compliant with applicable regulations, and that the operators of the equipment were appropriately trained and certified. While the State provided some of the documents requested, it did not produce each document listed in Weldele's motion for discovery. Weldele subsequently filed a motion in limine to preclude admission of the results of the breath tests on the grounds that the State had failed to provide the full scope of discovery requested and that the State had failed to establish the necessary foundation to render the test results admissible. The District Court denied the motion, concluding that the State had provided sufficient information with which Weldele could prepare his defense. The breath test results were admitted at trial. Weldele appeals the District Court's denial of his motion in limine and argues that the State's failure to fully produce requested documents and failure to adequately establish the foundation of the admissibility of the tests rendered the tests

16

inadmissible.

¶43     In deciding whether the District Court abused its discretion when it denied Weldele's motion in limine, we acknowledge that a district court has broad discretion to determine the relevance and admissibility of specific evidence. *State v. Woods* (1997), 285 Mont. 124, 947 P.2d 62. We presume that within this broad discretion is the sagacity to determine adequate compliance with pretrial discovery requests. Additionally, it is within the district court's sound discretion to determine whether an adequate foundation has been established to warrant admissibility of evidence. *State v. Delaney*, 1999 MT 317, ¶ 14, 297 Mont. 263, ¶ 14, 991 P.2d 461, ¶ 14.

¶44     The purpose of Weldele's extensive document request was to obtain information with which to prepare his defense with regard to the equipment used for BAC measurement. Conversely, the produced documents were intended by the State to establish the necessary foundation for admission of the breath test results into evidence. The District Court concluded that the information provided in response to the request for production was adequate for both Weldele's and the State's purposes. While the State's production was not as extensive as requested, and while we may believe that more information could and should have been produced by the State, we cannot conclude the District Court abused its discretion in this regard.

¶45     As the District Court found, the documents provided confirmed that 1) the officers were certified to operate both the PBT equipment and the Intoxilizer; 2) the Intoxilizer had received an annual certification less than five months before Weldele's use of it; 3) the

17

Intoxilizer solution was approved and used in compliance with applicable regulations; 4) the Intoxilizer was properly calibrated before and after Weldele's test; and 5) the PBT instrument was properly field certified. Thus, the documents produced by the State appeared to the District Court to adequately satisfy Weldele's concerns. We will not disturb this conclusion of the District Court.

¶46    We next consider whether the District Court erred in denying Weldele's motion in limine to preclude the use of the results of the preliminary breath test (PBT), a/k/a preliminary alcohol screening test (PAST), at trial.

¶47    Weldele argues that use of the PBT result should have been precluded at trial based upon the unreliability of PBT equipment when used in the field. He finds support for his argument in our decision *State v. Strizich* (1997), 286 Mont. 1, 952 P.2d 1365.

¶48    In *Strizich*, we reviewed the applicable statutes in effect at the time[2], the legislative history of those statutes, and the applicable administrative regulations.[3] At the time of Strizich's conviction, the statutes specifically provided that the results of blood or breath tests taken after arrest were admissible as evidence at a DUI trial, but that the results of preliminary breath tests taken in the field before arrest were to be used for probable cause purposes only and were not admissible at trial. Additionally, we reviewed the expert testimony presented to the District Court during the *Strizich* trials. The reason for precluding trial admission of the PBTs, according to both parties' expert witnesses, was that the

---

[2] Sections 61-8-402, -404, -409, MCA (1995)

[3] Rule 23.4.201(7)(b), ARM (1995)

18

equipment used in the field had a high degree of variability and unreliability. As a result, the *Strizich* Court concluded that use of the PBT/PAST results should be restricted to estimating alcohol concentration for probable cause purposes, and should not be relied upon for an exact BAC to be used as trial evidence. *Strizich*, 286 Mont. at 12, 952 P.2d at 1372.

¶49  Weldele maintains that our ruling in *Strizich* remains viable despite statutory changes and should be applied to his case. The State counters that because the Legislature revised the applicable statute, § 61-8-404, MCA, in 1997 and specifically authorized admissibility of PAST results as trial evidence, *Strizich* is no longer applicable. Upon careful analysis, we must disagree with the State for the reasons presented below.

¶50  As a preliminary matter, we note that the Legislature did not change the language of § 61-8-409(1), MCA, which continues to provide that the purpose of the PAST is "*estimating* the person's alcohol concentration." (Court's emphasis). Moreover, the regulations in effect at the time Weldele was convicted of his 2000 DUI continue to restrict consideration of the results as "probable cause evidence only." Rule 23.4.201(7)(b), ARM (1995). We turn now to the 1997 statutory revisions.

¶51  There is no doubt that the Legislature has the power to enact laws, including laws prescribing rules regarding evidence admissibility. This is a well-settled legislative prerogative in Montana. *City of Missoula v. Robertson*, 2002 MT 52, ¶ 53, 298 Mont. 419, ¶ 53, 998 P.2d 144, ¶ 53. And while the actions and words of the Legislature carry great weight with this Court, there are, nonetheless, times when state statutes and judicial rules of

procedure followed by this Court, as a member of an independent branch of government, directly conflict. This is such a time. The determination of the admissibility, reliability and relevance of evidence has long been a matter of judicial discretion. As we recently stated in *City of Missoula*, ¶ 55, the existence of admissibility language in a statute, while persuasive, "by no means . . . usurp[s] all discretion from the judiciary in making sound decisions regarding the admissibility of evidence."

¶52 Clearly, the 1997 amendments directly conflict with the result we reached in *Strizich*. In an effort to resolve this conflict, we carefully reviewed the scientific information provided during the *Strizich* trials as well as the legislative history behind the 1997 amendment to the statute. We were searching for convincing scientific evidence establishing that PBTs performed in the field are precise and reliable. Such a search, however, proved fruitless and for the reasons explained below failed to assuage our concerns.

¶53 During the *Strizich* trials of April and August, 1996, two experts testified repeatedly, while under oath, that the sole function of the PBT is to establish probable cause and that under field conditions, the results can be influenced by numerous physiological, instrumental and operator-induced factors. One of the experts, Phil Lively, testified to a margin of error of 10%--an extremely wide variable when a variation of .01% can conceivably mean the difference between conviction and acquittal. A scant five months later during statute amendment deliberations, when questioned by the Senate Judiciary Committee (Committee) specifically about the reliability of the equipment, the same expert explained pre-distribution approval processes, post-distribution testing and maintenance programs, and a 5% accuracy

requirement, but at no time did he mention any of the many factors that can influence the reliability of the equipment under field conditions. In fact, the oral testimony and most of the written material presented to the Committee appeared designed to ensure support for revising the statute rather than to dispel any concerns about the unreliability of the equipment. We further note that while the transcript of the *Strizich* expert testimony was within the voluminous written material provided to the Committee, it does not appear that the Legislature took account of the experts' unequivocal testimony from that trial that the PBT was unreliable as conclusive evidence of intoxication. Significantly, in neither the oral testimony nor the written exhibits presented to the Committee did we find any evidence that the science of PBTs or PBT equipment had changed or improved between the *Strizich* trial in August 1996 and the legislative amendment deliberations in January 1997.

¶54     It is also notable that numerous witnesses testified during the Committee hearings that they were not seeking to have the PBT results admitted as "stand alone" evidence. Rather, they wanted PBT results to be given "at least as much value in terms of competent evidence in assessing whether an individual was under the influence of alcohol as we are currently comporting officer observations, HGNs and field sobriety tests which are routinely admitted in DUI prosecutions." However, when the Legislature revised the statute, it did not incorporate the caveat that the results of the PBT be used only in conjunction with other field tests and observations. As written, the statute can be interpreted to allow admission of PBT results either with or without this additional corroborating evidence.

¶55     PBTs are qualitatively different from field tests, which call for a subjective analysis

21

of a person's behavior. A PBT utilizes a scientific instrument to test a person's chemistry. In this scientific age, it is indisputable that, fairly or not, the result of a PBT, given its scientific nature, will be weighed heavily by a jury and will likely be accorded more weight than the other field tests. We conclude, therefore, that our many concerns pertaining to the PBT, *i.e.*, its unreliability, lack of regulation and potentially inappropriate evidentiary weight, are not addressed or cured by admitting the PBT result into evidence in conjunction with the arresting officer's observations and field sobriety test results.

¶56 We also note that our position on this issue is not a unique one. According to the "Summary of State and Federal Court Decisions and Rules Governing Admissibility of Preliminary Breath Test Results" provided by Amicus Curiae in the case at bar, the majority of states in the country still allow PBT results to be used only for probable cause rather than as substantive evidence of intoxication. This fact further supports our continuing reluctance to expand its admissibility.

¶57 Our analysis of this issue thus returns us to the conclusion that preliminary breath testing in the field as it is currently administered remains statistically unreliable. Because the statistical result of such a test could upon admission at trial determine guilt, the test result must be demonstrably accurate. This is not to say that we will never approve trial admission of this evidence. The State may take the opportunity at any time to establish PBT reliability. If the State in any given case establishes that the PBT results it seeks to admit are reliable and accurate, the results could then be admissible if they otherwise satisfy all other requirements for admissibility.

22

¶58    In sum, the current law relative to the admissibility of PBT evidence remains the law as set forth in *Strizich*; it has not been overruled and district courts are bound by it. Under *Strizich*, Weldele was not obligated to prove that the PBT was unreliable. Rather, the State had the burden of offering scientific and expert testimony to establish the test's reliability. Because it did not do so, the District Court did not have the opportunity to determine, based upon scientific evidence, whether the PBT equipment used to test Weldele produced reliable and accurate results. Instead, the District Court relied upon the newly enacted statutory language of § 61-8-404, MCA, and denied Weldele's motion in limine, thereby allowing the State to enter the PBT results into evidence at trial. This was an understandable but erroneous legal conclusion.

¶59    However, while we conclude that the District Court erred by admitting Weldele's PBT reading of .154 into evidence at trial, we also conclude that in this case such error was harmless under our holding in *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735.

¶60    In *Van Kirk*, we adopted a two-step analysis to determine whether an alleged error prejudices a criminal defendant's right to a fair trial and is therefore reversible. The first step in the analysis is an inquiry of whether the claimed error is categorized as "structural" error or "trial" error. *Van Kirk*, ¶ 37. Structural error is automatically reversible and requires no additional analysis or review. *Van Kirk*, ¶ 39. Examples of structural error include errors in the jury selection process (*State v. LaMere*, 2000 MT 45, 298 Mont. 358, 2 P.3d 204); total deprivation of the right to counsel (*Gideon*, 372 U.S. 335); and lack of an impartial trial

23

judge (*Tumey v. Ohio* (1927), 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749).

¶61     Trial error, on the other hand, is not presumptively prejudicial and therefore not automatically reversible, and is subject to review under our harmless error statute, § 46-20-701(1), MCA. Trial error typically occurs during the presentation of a case to the jury. *Van Kirk*, ¶ 40.  In the case *sub judice*, the error occurred when the inadmissible evidence was presented during the trial, and thus, this was trial error.

¶62     As we did in *Van Kirk*, we analyze whether inadmissible evidence was erroneously admitted, and whether the defendant was prejudiced by such erroneous admission, *i.e.*, "whether there was a reasonable possibility that the erroneously admitted evidence might have contributed to the conviction." *Van Kirk*, ¶ 43.  To answer this query, we utilize the "cumulative evidence" test developed in *Van Kirk*.  Under this test, we determine whether the fact-finder was presented with admissible evidence that proved the same facts as the tainted evidence proved.  *Van Kirk*, ¶ 43.  Additionally, the State would be required to demonstrate that the quality of the tainted evidence was such that there was no reasonable possibility that it might have contributed to the defendant's conviction. *Van Kirk*, ¶ 44.  We drew an important distinction in *Van Kirk* between tainted evidence tending to prove an element of the crime charged and tainted evidence that does not go to the proof of an element of the crime charged.  *Van Kirk*, ¶¶ 45-46.

¶63     The "tainted evidence" in the case at bar was Weldele's PBT result which was admitted to prove intoxication, an element of the crime with which he was charged.  Thus, under *Van Kirk*, "[t]he State . . . must demonstrate that (a) there was other admissible

24

(cumulative) evidence demonstrating the 'under the influence' element of the crime charged; and (b) that, qualitatively no reasonable possibility exists that the tainted evidence might have contributed to [Weldele's] conviction." *Van Kirk*, ¶ 48. Weldele's PBT result was not the *only* evidence presented to prove intoxication. Also admitted were the arresting officer's field observations, the results of Weldele's field sobriety tests, and his Intoxilizer result of .171. The accuracy, reliability, and admissibility of the Intoxilizer result were not challenged. The Intoxilizer result, on its own, established the "under the influence" element of the crime charged, thereby rendering the PBT result redundant, unnecessary, non-prejudicial and harmless. As a result, we will not disturb the District Court's ruling on this issue.

*The District Court's denial of untimely pretrial motions*

¶64    We next consider whether the District Court erred when it denied various motions filed by Weldele at the pretrial conference as untimely.

¶65    The District Court entered an Order on July 17, 2000, instructing counsel that all pretrial motions including motions in limine had to be filed with the court by July 28, 2000. Weldele filed a motion in limine and a motion to suppress evidence on November 1, 2000. The District Court denied the motions as untimely.

¶66    While it may have been within the court's discretion to modify the scheduling order and accept the motions, it was also within its discretion to deny such motions as untimely based upon Weldele's failure to comply with the scheduling order. Section 46-13-101(2), MCA, allows, "Failure of a party to raise defenses or objections or to make requests that

25

must be made prior to trial, at the time set by the court, constitutes a waiver of the defense, objection, or request." We find no fault with the District Court's decision, recognizing that the court is in the best position to determine which sanctions are most appropriate for the offending conduct. Denial of a motion in limine filed in disregard of a scheduling order is not an abuse of discretion. *See Seal v. Woodrows Pharmacy*, 1999 MT 247, 296 Mont. 197, 988 P.2d 1230.

¶67    Applying the same rationale to the District Court's denial of Weldele's untimely motion to suppress, we affirm the court's denial of that motion as well.

*Weldele's ineffective assistance of counsel claims*

¶68    We turn next to the question of whether Weldele's counsel was ineffective for failing to file the denied motions in a timely manner. To assess a claim of ineffective assistance of counsel, both on direct appeal and in post-conviction proceedings, this Court applies the two-prong test from *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, which requires the defendant to "show that his counsel's performance was deficient and that the deficient performance prejudiced the defense and deprived the defendant of a fair trial." *Porter v. State*, 2002 MT 319, 313 Mont. 149, 60 P.3d 951 (citation omitted).

¶69    Weldele's attorney challenges her own effectiveness with this issue. She argues that if this Court affirms the District Court's denial of the untimely-filed motions, then she provided ineffective assistance to Weldele by failing to file these motions in a timely manner. In this connection, we note an observation made several years ago by the California Supreme Court, "Self-proclaimed inadequacies on the part of trial counsel in aid of a client

26

on appeal are not persuasive." *People v. Beagle* (Cal. 1972), 492 P.2d 1.

¶70    First, it is important to recall that there is a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. To overcome this presumption, a defendant bears the burden of showing that counsel's performance fell below an objective standard of reasonableness, and if so, that defendant was actually prejudiced by counsel's deficient performance. *Strickland,* 466 U.S. at 688 and 692. Arguably inadequate professional performance will not warrant overturning a judgment if the counsel's error had no effect on the judgment. The inquiry is whether, absent counsel's deficient representation, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

¶71    An evaluation of counsel's overall representation of Weldele throughout the case at bar reveals that counsel's assistance did not fall below the reasonable standard. She zealously and conscientiously represented Weldele by filing a multitude of pretrial motions, including a motion to dismiss, seeking to protect her client. She and co-counsel earnestly assisted Weldele during his jury trial and aggressively sought to protect his interests through objections and a motion for mistrial. In light of her active and diligent representation of Weldele as displayed in the record of this case, we conclude that Weldele has not satisfied the first prong of the *Strickland* test. Quite simply, the late filing of two of many pretrial motions does not rise to the level of a patently deficient performance. Because we find no overall deficiency of performance, we need not determine whether the prejudice prong of

27

*Strickland* has been satisfied.

*The District Court's refusal to grant a mistrial*

¶72     Finally, we consider whether the District Court erred in refusing to grant a mistrial after a witness repeatedly referred to alleged prior bad acts by Weldele. We review the grant or denial of a motion for mistrial for an abuse of discretion. The test for abuse of discretion is whether the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. *Kiely Const., L.L.C. v. City of Red Lodge*, 2002 MT 241, 312 Mont. 52, 57 P.3d 836.

¶73     In the case *sub judice*, the District Court granted a pretrial motion in limine prohibiting any reference to prior bad acts allegedly committed by Weldele. Sheridan had been advised of this testimonial restriction. Nonetheless, on three different occasions during her testimony she alluded to a previous, unreported domestic altercation between her and Weldele. While describing Weldele's assault on J.B., Sheridan stated, "all my memories come back of what he did to me back in October." Weldele's attorney objected and Sheridan was cautioned at that time by her attorney to confine her testimony to the events of February 14. Moments later she stated, "I cried and I said this is the last time it is going to happen and I called the cops." Shortly thereafter, when testifying to the details of the investigating officer's evidence collection in her kitchen, she testified, "because me and my daughter were sitting there going oh God he did it again." Weldele's attorney again objected and requested a chamber conference.

¶74     In chambers, Weldele moved for a mistrial. The court denied the request but offered

28

to issue a cautionary jury instruction drafted by Weldele's attorneys. The instruction was drafted and the court delivered it upon returning to the courtroom. The court told the jury that Weldele was to be tried solely on the allegations relating to February 14, 2000, that there had been no prior allegation of domestic abuse between the parties, and that the jury was to disregard any additional accusations made by Sheridan. Weldele claims that this instruction was insufficient and that, as a result of Sheridan's testimony, he was denied a fair and impartial trial.

¶75    A district court's determination of whether to grant a motion for a mistrial must be based on whether the defendant has been denied a fair and impartial trial. *State v. Soraich*, 1999 MT 87, ¶ 17, 294 Mont. 175, ¶ 17, 979 P.2d 206, ¶ 17 (citation omitted). We declared in *State v. Partin* (1997), 287 Mont. 12, 18, 951 P.2d 1002, 1005-06, that where there is a reasonable possibility that inadmissible evidence might have contributed to the conviction, a mistrial is appropriate. In determining whether a prohibited statement contributed to a conviction, we consider the strength of the evidence against the defendant, the prejudicial effect of the testimony, and whether a cautionary jury instruction could cure any prejudice. *State v. Scarborough*, 2000 MT 301, ¶ 81, 302 Mont. 350, ¶ 81, 14 P.3d 1202, ¶ 81 (*citing Partin*, 287 Mont. at 18, 951 P.2d at 1005-06).

¶76    In the case at bar, while Sheridan's statements imply that a previous altercation occurred between Weldele and Sheridan, they are not so prejudicial, in light of the verdict, the evidence, and the cautionary instruction, as to warrant a mistrial. Significantly, the jury considered an assault charge by Weldele against Sheridan, but it found him not guilty of that

29

charge. Moreover, there was sufficient evidence presented at trial to find Weldele guilty of assaulting J.B. Lastly, the instruction to the jury to disregard the inappropriate references because "no prior allegations of domestic abuse between these two parties" existed was sufficient in these circumstances. We therefore conclude the District Court did not abuse its discretion when it denied Weldele's motion for a mistrial.

## CONCLUSION

¶77 For the reasons stated in this Opinion, we affirm the decision of the District Court in all respects.

/S/ PATRICIA COTTER

We Concur:

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART
/S/ JIM REGNIER

Justice Jim Rice, specially concurring.

¶78    I concur with the holding of the Court on all issues herein, but disagree with the Court's conclusion that the District Court erred in allowing the results of the preliminary alcohol screening test or preliminary breath test (PAST or PBT) as evidence in the trial, and dissent therefrom.

¶79    First, I disagree with the Court's interpretation of the *Strizich* decision.  The Court characterizes *Strizich* as holding that PAST results suffer *inherent unreliability* as a matter of law and then affirms that decision.  *See* ¶¶ 48 and 58.  This characterization of *Strizich*, in my view, is not entirely accurate.  *Strizich* made no finding of *inherent unreliability*.

¶80    The more accurate view is that *Strizich* did not hold that the PAST was *inherently unreliable* as a matter of law, but rather, that it was *inadmissible* as a matter of law.  There is brief language in the opinion which may cause some confusion, but a careful reading demonstrates this point.  First, the *Strizich* Court explained that § 61-8-404, MCA, provided that results from *post*-arrest tests were admissible as evidence in a DUI trial, but that, in direct contrast, § 61-8-409, MCA, only provided that the PAST may be used in determining whether probable cause exists for an arrest, observing "[t]here is no suggestion in § 61-8-409, MCA, that the results of a PBT are admissible as substantive evidence to establish a person's guilt."  *Strizich*, 286 Mont. at 11, 952 P.2d at 1371.  The Court noted that the legislative history was consistent with this statutory language.

¶81    The *Strizich* Court then noted that there were reasons for this "legislative decision."  The Court quoted briefly from expert witnesses who had testified that the test is reliable in controlled situations, but that "variances" could occur, depending upon environmental

32

factors. The Court concluded that the test was an "estimate" and restricted to probable cause determinations by the governing statutes. Thus, the Court reasoned that a "legislative decision" had prohibited the use of the evidence at trial, and that this decision was supported by the trial record. It did not hold that the trial record had conclusively demonstrated that the test was *inherently unreliable* as a matter of law.

¶82    The 1997 Legislature changed this "legislative decision" by enacting Senate Bill 106, and thereby revised the very statutes the Court had relied upon in *Strizich*. Senate Bill 106 included the PAST within the list of tests set forth in § 61-8-404, MCA, as admissible at trial, and struck the language in § 61-8-409, MCA, which had referenced its use for probable cause determinations. See Chapter No. 88, Laws of Montana (1997). While reliability of the PAST may have been addressed during legislative hearings, the Legislature itself made no attempt to pre-determine that such evidence was reliable in every instance any more than it had done so for other DUI-related tests. It simply removed the statutory impediments to admissibility which the Court had pointed out in *Strizich*. In short, the 1997 amendments provided that the PAST was "admissible," but did not insulate the test from foundational challenges, including reliability.

¶83    Prior to trial, Weldele challenged the Legislature's actions, arguing in his motion in limine that the solons' attempt to insert this evidence in a trial was invalid because "[t]he legislature cannot make the PBT sufficiently reliable to be admissible simply by saying it is." The Defendant was absolutely correct in this statement, but the statement is not an accurate reflection of what the Legislature did. It did not legislate reliability, but simply repealed the statutory declaration that the evidence was inadmissible as a matter of law.

¶84     Ruling on Weldele's motion in limine, the District Court called it exactly right: "The language of these [1997] statutory revisions clearly *permits* the use of the PBT results in trial. The *reliability* of the PBT may be established at trial." (Emphasis added.) The District Court thus acknowledged that the statutory impediments to admissibility relied on in *Strizich* had been removed, but that reliability remained an issue to be determined in the trial.

¶85     At trial, the State provided foundational evidence only in regard to the machine's certification and the officer's training, and then offered the test results for introduction. This was Weldele's opportunity to challenge the science underlying the PAST, but he failed to do so. Instead, he merely renewed his objection that the State had failed to provide full discovery and should be prohibited from using the evidence for that reason, which is the fourth issue resolved by the Court's opinion herein. Reliability of the PAST was not challenged at trial, and thus, a record was not made on that issue, either by the Defendant or by the State. This is sufficient reason by itself to affirm the decision of the District Court, and this Court should do so on that basis, and stop there.

¶86     Instead, the Court embarks on, in my opinion, a quixotic quest to determine reliability of this evidence on its own. Lacking any record on this issue, the Court nonetheless decides the issue by (1) analyzing the record in the *Strizich* case, and (2) analyzing the legislative history of the 1997 amendments. *See* ¶¶ 52-54. I respectfully submit that by doing so the Court has engaged in an inappropriate mode of review. Neither party here was before us in *Strizich*, and even if they were, our duty is to decide this case on the record made before the District Court here, not a record from a different case. Further, we do not determine the scientific reliability of evidence by a review of legislative history. In *Hulse v. State*, 1998

MT 108, 289 Mont. 1, 961 P.2d 75, the proper method of determining reliability was set forth in the Court's extensive discussion of the admission of scientific evidence, there addressing the Horizontal Gaze Nystagmus test:

> We agree that the HGN is not **novel** scientific evidence. Therefore, to determine the admissibility of HGN test results, a district court need not employ the *Daubert* standard. However, we continue to recognize that the relationship between alcohol consumption and nystagmus, the underlying scientific principle of the HGN test, is still beyond the range of ordinary training or intelligence. Therefore, <u>a district court must still conduct a conventional Rule 702, M.R.Evid., analysis to determine the admissibility of HGN test results</u> . . . .
>
> . . . *Clark* . . . illustrates that a foundation showing that the arresting officer is qualified to testify as to the HGN test *results* does not provide a sufficient basis for the officer to testify as to the scientific basis of the HGN test.
>
> . . . .
>
> . . . Officer Kennedy was trained to administer the HGN test and, in fact, administered the HGN test on Hulse in accordance with this training, and, therefore, he was qualified to testify as to both his administration of the HGN test and his evaluation of Hulse's performance. However, nothing in the evidence establishes that Officer Kennedy had special training or education nor adequate knowledge qualifying him as an expert to explain the correlation between alcohol consumption and nystagmus, the underlying scientific basis of the HGN test. Accordingly, we conclude there was insufficient foundation for the admission of evidence concerning the HGN test and the District Court abused its discretion when it summarily denied Hulse's motion *in limine* . . . .

*Hulse*, ¶¶ 69-72 (underlining added). This proper determination of the reliability of the evidence did not occur here.

¶87    The District Court did not summarily deny all challenges to reliability, but simply, and correctly, denied Weldele's argument that the statutes still preempted admission of PAST evidence, and held that the evidence could be introduced *if* it was shown to be reliable.

35

At trial, Officer Goetz testified concerning his training and certification to operate a PAST instrument, and the purpose of the test. He did not, however, testify concerning what *Hulse* describes as "the underlying scientific basis" of the PAST, and therefore, presented insufficient foundation for the admission of the test. However, no objection was raised by the Defendant to that insufficiency, no evidence was offered by the State concerning the scientific basis for the test and thus, no record was made. Thus, the District Court was given no opportunity to "conduct a conventional Rule 702, M.R.Evid., analysis" and rule on reliability. *Hulse*, ¶ 69.

¶88    Given this posture of the matter, we should decline to issue a ruling declaring PAST evidence to be unreliable as a matter of law and consider this issue at a time when we have a proper record before us. I would affirm on that basis.

/S/ JIM RICE


Chief Justice Karla M. Gray joins the concurring opinion of Justice Rice.


/S/ KARLA M. GRAY

Justice Terry N. Trieweiler specially concurring.

¶89    I concur with the result of the majority Opinion.  However, I do not agree with all that is stated in that Opinion.

¶90    Specifically, I disagree with that part of the majority Opinion which discusses the effect of 1997 statutory amendments on our decision in *State v. Strizich* (1997), 286 Mont. 1, 952 P.2d 1365.

¶91    The majority states in ¶ 48 that at the time of Strizich's conviction, Montana's statutes provided that preliminary breath tests were not admissible at trial.  However, that is not correct.  Section 61-8-409(2), MCA (1995), simply provided that:

> (2) The results of a screening test may be used for determining whether probable cause exists to believe a person has violated 61-8-401, 61-8-406, or 61-8-410.

¶92    Section 61-8-409, MCA (1995), included no express prohibition against the use of PBT evidence for purposes other than establishing probable cause and § 61-8-404, MCA (1995), made no mention of PBT evidence whatsoever.

¶93    The most specific reference to the limitations on PBT evidence prior to 1997 was Rule 23.4.201(7)(b), ARM (1995), which provided, in relevant part:

> Analyses from this type of device, e.g. a preliminary breath tester, are to be considered as probable cause evidence only.

¶94    Rule 23.4.201(7)(b), ARM (1995), was still in effect at the time of Weldele's arrest and conviction.  However, by then the legislature had amended § 61-8-409, MCA (1995), to delete subparagraph (2) and had amended § 61-8-404, MCA, to include PBTs (therein

37

referred to as "preliminary alcohol screening test") among those breath tests which are now admissible. However, the statute does not specify the purpose for which the test results are admissible and the statute is not limited in its application to trials at which the substantive issue of guilt is determined. It also refers to "other proceedings." Other proceedings include pretrial hearings to consider the suppression of evidence or to determine whether probable cause existed for an arrest. Therefore, I find nothing inconsistent with the legislative amendments made in 1997 and this Court's prior decision in *Strizich*. In particular, I disagree with the majority's statement in ¶ 52 that the 1997 amendments directly conflict with the result we reached in *Strizich*.

¶95     Our decision in *Strizich* had several underpinnings. We noted 1) that § 61-8-409(1), MCA (1995), specifically provided that a PBT is for the purpose of "estimating" alcohol concentration, 2) that § 61-8-409(2), MCA (1995), made specific reference to the purpose of a PBT being to establish probable cause, 3) that there was no specific suggestion in § 61-8-409, MCA (1995), that PBTs are admissible as substantive evidence of guilt, 4) that Rule 23.4.201(7)(b), ARM (1995), specifically limited the purpose for which PBT evidence can be offered, and 5) that the record from the District Court established as a matter of fact that the procedure is unreliable and inaccurate as a measurement of alcohol concentration. *Strizich*, 286 Mont. at 11-12, 952 P.2d at 1371-72.

¶96     Of all the reasons given in the *Strizich* Opinion for excluding the evidence, the only thing that has changed is that § 61-8-409, MCA (1997), no longer refers to the use of PBTs to establish probable cause and § 61-8-404, MCA (1997), now lists PBTs among the types of tests that can be admitted at trials or other proceedings. Therefore, I conclude there is

38

nothing inconsistent about the 1997 legislative amendments and our decision in *Strizich*. While some of the language relied on for the conclusion arrived at in that case no longer exists in the Montana Code, neither is there any language added to the code which requires that preliminary breath tests be admitted at a trial as evidence of a defendant's guilt.

¶97    I also disagree with the majority's suggestion that this issue will be reviewed on a case-by-case basis and re-analyzed based on the quality of proof in every criminal case in which the evidence is offered. We all know that the quality of representation for criminal defendants is extremely inconsistent. The majority's suggestion could result in preliminary breath test admissibility in one case where it is not adequately challenged on a scientific basis and exclusion in another case where, because of the superior quality of representation or the fact that greater resources are available for scientific or expert opinion evidence, the inadequacies of the test are more clearly established. This type of process provides no guidance to district courts, will lead to inconsistent results, and suggests that the basis for convictions will depend simply on the quality of representation provided to criminal defendants.

¶98    I would conclude that absent some evidence that the design or construction and reliability of the instruments by which preliminary breath tests are administered has changed significantly since our decision in *Strizich*, that decision is binding on district courts in the future.

¶99    For these reasons, while I concur in the result arrived at by the majority, I do not agree with all that is said in the majority Opinion.

/S/ TERRY N. TRIEWEILER

39