JUSTICE LEAPHART
delivered the Opinion of the Court.
¶1 Raul C. Sanchez (Sanchez) appeals from his conviction in the Twentieth Judicial District, Sanders County, of deliberate homicide. We affirm.
¶2 We restate the issues as follows:
¶3 Did the District Court improperly allow Aleasha’s statements to be introduced over Sanchez’s hearsay objections?
¶4 Did the introduction of Aleasha’s note violate Sanchez’s Sixth Amendment right to confrontation?
¶5 Did the prosecutor’s closing argument deny Sanchez the right to a fair trial?
¶6 Did the “lesser included offense” language of the mitigated deliberate homicide instruction impermissibly allow the jury to consider sentencing in reaching its verdict?
*242 BACKGROUND
¶7 Sanchez shot and killed Aleasha Chenowith (Aleasha) outside her home on the night of July 19, 2004. Later that evening, Sanchez turned himself in to law enforcement and admitted shooting Aleasha. The State charged Sanchez with deliberate homicide for Aleasha’s death.
¶8 Before trial, Sanchez moved to exclude a note the State proposed to offer as a trial exhibit. The note read:
To whom it concerns:
On July 8, 04 around 10:30 p [sic] Raul Sanchez Cardines told me if I ever was cought [sic] with another man while I was dating him, that he would kill me. Raul told me he had friends in Mexico that had medicine that would kill me and our doctors wouldn’t know what it was till it was to [sic] late and I would be dead.
So if I unexspetly [sic] become sick and on the edge of death, and perhaps I die no [sic] you will have some answers.
Aleasha Chenowith (written and printed signature)
¶9 Sanchez argued that the note should be excluded because it contained inadmissible multiple hearsay and would also violate his Sixth Amendment right to confrontation. The District Court denied Sanchez’s motion and ruled that Aleasha’s note was admissible as a statement under belief of impending death, pursuant to M. R. Evid. 804(b)(2). The District Court concluded that Sanchez’s statements within the note were admissible as either a statement against interest, pursuant to M. R. Evid. 804(b)(3), or as a statement describing Sanchez’s then existing state of mind, pursuant to M. R. Evid. 803(3). The District Court did not address Sanchez’s Confrontation Clause claim. Sanchez’s jury trial began on June 13, 2005.
¶10 At trial, Sanchez testified that he and Aleasha had been dating for approximately four-and-a-half months and that he had contemplated marrying Aleasha. However, Sanchez became suspicious that Aleasha was cheating on him with Angel, one of Sanchez’s co-workers. On July 19, 2004, Sanchez confronted Angel, who confirmed Sanchez’s suspicions. Sanchez testified that when he later spoke with Aleasha, she threatened to create problems for him with law enforcement so that Sanchez would ultimately have his children taken away from him. According to Sanchez, he felt as though “something got dark in [his] head[,]” and he shot Aleasha several times.
¶11 At trial, the State introduced several statements that Aleasha made to others before her death. In addition to the note, the State elicited testimony about other instances in which Sanchez purportedly *243 threatened Aleasha. Pamela Ehrlich testified that Aleasha told her about an argument she had with Sanchez. According to Ehrlich’s testimony, during the argument Sanchez stated, “Me love you, [Aleasha]. Me not love you that much. You cross me, I kill you.” The District Court overruled Sanchez’s hearsay objection. Leann Chenowith, Aleasha’s sister, testified that Aleasha told her that “if [Aleasha] ever made [Sanchez] mad ... he had stuff in Mexico that his friend could give him, and that it would eat her stomach in a matter of days.” This statement was also admitted over Sanchez’s hearsay objection.
¶12 During closing arguments, the prosecutor argued that the jury could convict Sanchez of mitigated deliberate homicide only if the jury found that Sanchez’s response to extreme emotional distress was reasonable, rather than that his explanation for the extreme emotional distress was reasonable. Defense counsel objected that the prosecutor was misinterpreting the jury instructions, and the District Court overruled the objection.
¶13 Sanchez objected throughout the proceedings to the mitigated deliberate homicide jury instruction because the instruction stated that mitigated deliberate homicide was a “lesser included offense” of deliberate homicide. Sanchez argued that the instruction allowed the jurors to indirectly consider sentencing factors in their deliberations. The District Court overruled Sanchez’s objection.
¶14 The jury convicted Sanchez of deliberate homicide, and the District Court sentenced Sanchez to life without parole in Montana State Prison. Sanchez appeals his conviction.
STANDARD OF REVIEW
¶15 We review a district court’s evidentiary rulings for abuse of discretion. State v. Mizenko, 2006 MT 11, ¶ 8, 330 Mont. 299, ¶ 8, 127 P.3d 458, ¶ 8. A court abuses its discretion when it acts arbitrarily, without employing conscientious judgment, or exceeds the bounds of reason, resulting in substantial injustice. State v. Weldele, 2003 MT 117, ¶ 72, 315 Mont. 452, ¶ 72, 69 P.3d 1162, ¶ 72. We review de novo a district court’s interpretation of the Sixth Amendment. Mizenko, ¶ 8. In criminal cases, we review jury instructions in their entirety to determine if they fully and fairly presented the applicable law to the jury. State v. Detonancour, 2001 MT 213, ¶ 57, 306 Mont. 389, ¶ 57, 34 P.3d 487, ¶ 57.
*244 DISCUSSION
¶16 I. Did the District Court improperly allow Aleasha’s statements to be introduced over Sanchez’s hearsay objections?
¶17 “Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted” within the statement. M. R. Evid. 801(c). Hearsay is inadmissible “except as otherwise provided by statute, these rules [of evidence], or other rules applicable in the courts of this state.” M. R. Evid. 802. Sanchez asserts that the District Court erred when it admitted, over hearsay objections, Aleasha’s statements to her sister, Aleasha’s statements to her neighbor, and Aleasha’s note. According to Sanchez, these three statements contain double hearsay and thus, to be admissible, must comply with the multiple-hearsay rule, which requires that all instances of hearsay within a statement conform to a hearsay exception. M. R. Evid. 805. We note at the outset that these three statements contain only one level of hearsay. Montana Rule of Evidence 801(d)(2) provides:
Statements which are not hearsay. A statement is not hearsay if: ... (2) Admission by party-opponent. The statement is offered against a party and is (A) the party’s own statement, in either an individual or a representative capacity ....
(Paragraph breaks omitted.) Thus, the statements attributable to Sanchez are exempt from the hearsay definition; they are not hearsay.

A. Aleasha’s statement to her sister

¶18 Leann Chenowith testified that Aleasha told her that Sanchez had threatened that “if [Aleasha] ever made [Sanchez] mad... he had stuff in Mexico that his friend could give him, and that it would eat her stomach in a matter of days.” The District Court overruled Sanchez’s hearsay objection without stating a specific rationale. Sanchez argues that no hearsay exception applies to this statement and that the District Court erred in admitting the statement.
¶19 We conclude that the District Court correctly overruled Sanchez’s hearsay objection to Leann Chenowith’s testimony because the statement falls outside the hearsay definition. Though Aleasha made the statement outside the courtroom, the record reveals no indication that the State sought to prove that Sanchez actually could obtain poison from acquaintances in Mexico. The State may have offered the statement to show a pattern of threats or that Sanchez contemplated killing Aleasha; however, these rationales are not objectionable on hearsay grounds. The District Court correctly *245 overruled Sanchez’s hearsay objection because the State did not offer the statement to prove the truth of the matter asserted, and thus, the statement was not hearsay.

B. Aleasha’s statement to her neighbor

¶20 Pamela Ehrlich testified that Aleasha told her that, during an argument, Sanchez stated, “[m]e love you, [Aleasha]. Me not love you that much. You cross me, I kill you.” The District Court again overruled Sanchez’s hearsay objection without stating a specific rationale. Sanchez argues that no hearsay exception applies to this statement and that the District Court erred in admitting the statement. The State apparently combines its arguments relating to the statements of Aleasha’s neighbor and Aleasha’s sister and responds that Aleasha’s statements could be admissible as excited utterances, present sense impressions, or statements made under a belief of impending death. Alternatively, the State argues that if the District Court erred its error was harmless.
¶21 Our review of the record convinces us that the hearsay exceptions proposed by the State are inapplicable to this statement. The “present sense impression” hearsay exception applies to statements made “while the declarant was perceiving the event or condition, or immediately thereafter.” M. R. Evid. 803(1). Ehrlich’s testimony reveals that Aleasha’s statement recounted a threat Sanchez made the prior evening. Thus, Aleasha’s statement described an event that she “perceived” the prior evening, rather than a “present sense impression.” The “excited utterance” hearsay exception applies to statements “relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.” M. R. Evid. 803(2). Ehrlich testified that Aleasha seemed unconcerned by Sanchez’s threat and that Aleasha remarked, “[Sanchez] was nothing more than a dumb little Mexican. He ain’t got the balls to do nothing.” Aleasha’s comments indicate that she lacked the “stress of excitement” necessary to implicate the excited utterance exception. Similarly, we conclude that the “statement under belief of impending death” hearsay exception is inapplicable because Aleasha’s comments indicate that she did not make the statement “while believing that [her] death was imminent,” and her statement did not concern “the cause or circumstance of what [she] believed to be impending death.” M. R. Evid. 804(b)(2).
¶22 Though no exceptions apply to Aleasha’s hearsay statement, we agree with the State that the District Court committed harmless error because the State presented other admissible evidence that proved the *246 same facts as the hearsay evidence. We apply the “cumulative evidence” test to determine whether a district court’s trial error is harmless. State v. Van Kirk, 2001 MT 184, ¶ 43, 306 Mont. 215, ¶ 43, 32 P.3d 735, ¶ 43. Under the “cumulative evidence” test, we consider a trial error harmless if the State demonstrates that the “fact-finder was presented with admissible evidence that proved the same facts as the tainted evidence and, qualitatively, by comparison, the tainted evidence would not have contributed to the conviction.” Van Kirk, ¶ 47. In Van Kirk, we abandoned the “overwhelming evidence” test, which emphasized the quantity of admissible evidence proving guilt, in favor of the “cumulative evidence” test, which focuses on the qualitative impact the inadmissible evidence may have on the fact-finder. Van Kirk, ¶ 43.
¶23 Sanchez testified that his suspicions of Aleasha’s infidelity were confirmed on Monday morning, July 19, 2004, when Angel, a coworker, admitted sleeping with Aleasha. Sanchez testified that he then arranged for his daughters to sleep at a friend’s house so that he and Aleasha could talk without his children present. He testified that he bagged up Aleasha’s clothes and dropped them off at her house. He knocked on the door, but no one answered, and Sanchez returned to work. Sanchez testified that he recognized a vehicle outside Aleasha’s house as he drove home from work and that he knew that Angel was at Aleasha’s house. Sanchez testified that he retrieved his pistol from his home, went to a store and bought ammunition, and then returned to Aleasha’s house. Again, no one answered the door, and Sanchez went home. When Aleasha called him that evening and asked him to come to her house, he returned to Aleasha’s and parked outside her house, with the gun on the seat next to him. He testified that she came outside, they argued, and he grabbed his gun and shot her when she threatened to have his children removed from his care.
¶24 Jason Sheehan, one of Sanchez’s co-workers, testified that Sanchez mentioned during the lunch break that Sanchez was upset because Aleasha had cheated on him. Sheehan testified that Sanchez stated that he was going to go to Aleasha’s house, drop off her clothes, and “maybe slap her around a little bit.” Sheehan also testified that Sanchez stated that “maybe he would get out his 9 [millimeter pistol] and go shoot her.” At no point did Sanchez object to Sheehan’s testimony.
¶25 In light of the damaging testimony from Sheehan and Sanchez, we conclude that the District Court committed harmless error in admitting Aleasha’s hearsay statement. The testimony of Sanchez and *247 Sheehan presented the jury with cumulative evidence that proved the same facts as Aleasha’s statement. Moreover, given the character of Sanchez’s and Sheehan’s in-court testimony, the jury was presented with evidence of deliberate homicide that qualitatively outweighed any impact that Aleasha’s statement may have had on the jury. The jury heard from Aleasha’s killer himself, that, after learning of Aleasha’s infidelity, he made arrangements for the care of his children, he went to the store and purchased ammunition, he took the loaded gun to Aleasha’s house, he waited for her to come outside, and he shot her after a brief argument. We conclude that the qualitative nature of Sanchez’s testimony outweighs any qualitative impact that Aleasha’s hearsay statement may have had on the jury and that no reasonable possibility exists that the hearsay statement contributed to the conviction, and thus, any error is harmless. Van Kirk, ¶ 47.

C. Aleasha’s note

¶26 At trial, the State offered a note written by Aleasha that stated:
To whom it concerns:
On July 8, 04 around 10:30 p [sic] Raul Sanchez Cardines told me if I ever was cought [sic] with another man while I was dating him, that he would kill me. Raul told me he had friends in Mexico that had medicine that would kill me and our doctors wouldn’t know what it was till it was to [sic] late and I would be dead.
So if I unexspetly [sic] become sick and on the edge of death, and perhaps I die no [sic] you will have some answers.
Aleasha Chenowith (written and printed signature)
Sanchez objected to the note’s admission on hearsay grounds throughout the pre-trial proceedings and at trial. The District Court overruled Sanchez’s hearsay objection and concluded that M. R. Evid. 804(b)(2), the hearsay exception for statements made under belief of impending death, removed Aleasha’s written statements from the hearsay rule. Sanchez argues that Aleasha’s note does not indicate that she feared imminent death, and thus, the District Court erred in admitting the note as a dying declaration.
¶27 We agree with Sanchez that the District Court incorrectly relied on the “statement under belief of impending death” hearsay exception to admit Aleasha’s note. This exception applies to statements “made by a declarant while believing that the declarant’s death was imminent, concerning the cause or circumstance of what the declarant believed to be impending death.” M. R. Evid. 804(b)(2). Aleasha’s statements that “if I [unexpectedly] become sick” and “perhaps I die” indicate that she viewed her death as neither certain nor imminent. (Emphases *248 added.)
¶28 However, as with Ehrlich’s testimony, we conclude that the District Court’s ruling constituted harmless error. As discussed in ¶ 19, the statements relating to Sanchez’s Mexico connections fall outside the hearsay definition because the State did not offer the statements to prove that Sanchez actually could obtain poison from sources in Mexico. Sanchez’s threat that he would kill Aleasha if she committed adultery presents the only questionable portion of Aleasha’s note. The threat’s substance essentially mirrors Sanchez’s “[y]ou cross me, I kill you” statement, and we conclude that this statement’s admission constitutes harmless error for the same reasons.
¶29 The testimony of Sheehan and Sanchez presented the jury with cumulative evidence that proved the same facts that Aleasha’s note sought to prove. Further the qualitative nature of their testimony outweighs any qualitative impact that Aleasha’s hearsay statement may have had on the jury; we can conceive of no evidence more qualitatively damning than Sanchez’s narration of the day he killed Aleasha. Further, Sheehan’s account of Sanchez’s lunchtime comment that “maybe he would get out his 9 and go shoot [Aleasha]” confirmed that Sanchez contemplated killing Aleasha shortly after learning of her transgression. In light of the evidence presented by Sanchez’s and Sheehan’s testimony, we conclude that no reasonable possibility exists that the statement in the note contributed to Sanchez’s conviction, and thus, any error is harmless. Van Kirk, ¶ 47.
¶30 II. Did the introduction of Aleasha’s note violate Sanchez’s Sixth Amendment right to confrontation?
¶31 Sanchez claims that the District Court violated his constitutional right to confrontation under both the United States and Montana Constitutions when it admitted Aleasha’s note as evidence. Sanchez argues that the note was “testimonial” hearsay and thus was inadmissible unless the court found (1) that the declarant was unavailable, and (2) that there was a prior opportunity for cross-examination. Though Sanchez concedes Aleasha’s unavailability, he asserts that he had no opportunity to question her about the note.
¶32 The Sixth Amendment of the United States Constitution, applicable to the States through the Fourteenth Amendment, guarantees criminal defendants the right to be confronted with the witnesses against them. The Sixth Amendment’s Confrontation Clause applies only to testimonial hearsay. Davis v. Washington, 547 U.S. 813, 822-826, 126 S. Ct. 2266, 2274-75 (2006). Testimonial hearsay statements are inadmissible unless the declarant is “unavailable” for *249 trial and the defendant had a prior opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004). The Supreme Court emphasized in Crawford that the Sixth Amendment mandates that a testimonial statement’s reliability be tested “in the crucible of cross-examination[,]” not left to the “vagaries of the rules of evidence ....” Crawford, 541 U.S. at 61, 124 S. Ct. at 1370. Additionally, Montana’s Constitution grants a defendant the right to “meet the witnesses against him face to face ....” Mont. Const, art. II, § 24. This provision clarifies that full cross-examination is a critical aspect of the confrontation right. State v. Clark, 1998 MT 221 ¶ 22, 290 Mont. 479, ¶ 22, 964 P.2d 766, ¶ 22.
¶33 Sanchez argues that Aleasha’s note, documenting the date and time of Sanchez’s alleged statement and the substance of his threat, is testimonial because it bears similarities to an affidavit. Additionally, Sanchez equates Aleasha’s note with Lord Cobham’s infamous letter, discussed by the Supreme Court in Crawford, that implicated Sir Walter Raleigh for treason. 541 U.S. at 44-45, 124 S. Ct. at 1360. The State argues that the note is non-testimonial because it reflects “an intent to direct attention (possibly only medical attention) to the reasons for any suspicious illness.”
¶34 Though the United States Supreme Court has declined to comprehensively define “testimonial,” it has supplied a consistent starting point:
[The Confrontation Clause] applies to “witnesses” against the accused-in other words, those who “bear testimony.” [1] N. Webster, An American Dictionary of the English Language (1828). “Testimony,” in turn, is typically “[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.” Ibid. An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.
Crawford, 541 U.S. at 51, 124 S. Ct. at 1364; see also Davis, 547 U.S. at 822, 126 S. Ct. at 2274. Thus, to determine whether a witness bears testimony, the Court finds significant the statement’s purpose, the statement’s context, and the audience the statement is intended to reach. In Davis, the Court seemingly retreated from its earlier pronouncements that “statements taken by police officers in the course of interrogations are... testimonial under even a narrow standard” and that “[w]hatever else the term [testimonial] covers, it applies at a minimum to... police interrogations.” Crawford, 541 U.S. at 52, 68, 124 S. Ct. at 1364, 1374. The Davis Court concluded that whether or not a *250 statement made to police officers during an interrogation is testimonial hinges on the interrogation’s primary purpose: if the interrogation’s primary purpose is to “establish or prove past events potentially relevant to later criminal prosecution[,]” the statement is testimonial; if the interrogation’s primary purpose is to “enable police assistance to meet an ongoing emergencyt,]” the statement is non-testimonial. Davis, 547 U.S. at 821-24, 126 S. Ct. at 2273-74. As the Supreme Court’s reasoning in Davis illustrates, the Court finds no particular inquiry dispositive in determining whether a statement is testimonial.
¶35 In State v. Mizenko, we discussed what constitutes a testimonial statement. In general, a declarant’s statements are presumed testimonial if they are knowingly made to a police officer or government agent. Mizenko, ¶ 23. A statement is presumed non-testimonial, however, if the declarant had “objective reason to believe” that the statement served only “to avert or mitigate an imminent or immediate danger” and the agent receiving the statement lacked intent to create evidence. Mizenko, ¶ 23. A statement made to a nongovernmental agent is non-testimonial -unless the declarant had “clear reason to believe that the statement would be used in court as substantive evidence against the defendant....” Mizenko, ¶ 23. Thus, though we declined to formulate a comprehensive definition of “testimonial,” we recognized that certain presumptions arise depending on the intended audience and the purpose of the statement.
¶36 In our Mizenko discussion we also found significant a statement’s context, and we looked to whether a declarant reasonably should expect that the State would use the declarant’s statements at trial. Mizenko, ¶¶ 17-21. We noted the Supreme Court’s characterization of “a casual remark to an acquaintance” as non-testimonial, Crawford, 541 U.S. at 51, 124 S. Ct. at 1364, and we explained that the word “‘casual’... modifies the declarant’s assumption as to what use, if any, the listener might make of the statement.” Mizenko, ¶ 17. If an objective declarant reasonably would expect the State to use the declarant’s statements at trial, then, absent an opportunity for confrontation, the Sixth Amendment bars the admissibility of such statements. Mizenko, ¶ 17. Further, we recognized that a statement’s characterization as testimonial did not depend on government involvement in the declarant’s making the statement: “ ‘Thus, if just before trial a person shoved a written statement under the courthouse door, asserting that the accused did in fact commit the crime, that would plainly be testimonial even though no government official played a role in preparing the statement.’ ” Mizenko, ¶ 19 (quoting *251 Richard D. Friedman, The Confrontation Clause Re-Rooted and Transformed, 2004 Cato Sup. Ct. Rev. 439, 458).
¶37 Aleasha addressed her note “[t]o whom it concerns[.]” Her stated reason for -writing the note was that “if I unexspetly [sic] become sick and on the edge of death, and perhaps I die no [sic] you will have some answers.” The note’s substance indicates that the note’s purpose was to explain her untimely death or poisoning, not to prevent or mitigate future harm. Aleasha’s short note named the person she suspected would kill her and the method he threatened to use. In essence, Aleasha’s note contained information that could establish or prove facts to answer questions regarding how, why, and by whom she had been harmed or killed. The State’s contention that the purpose of Aleasha’s note may have been to “direct attention (possibly only medical attention) to the reasons for any suspicious illness[,]” completely ignores the accusatory nature of the note (as does Justice Rice’s concurrence): in a nine-line note, Aleasha documented the date and time that Sanchez threatened her, she named Sanchez as her suspected killer, she described Sanchez’s motive, and she described his threatened method of execution. Though Aleasha did not address her note specifically to police officers, the note’s substance and its comprehensive salutation indicate that it reasonably included law enforcement.
¶38 Moreover, the circumstances surrounding Aleasha’s note indicate that it bears little similarity to a non-testimonial “casual remark to an acquaintance.” Crawford, 541 U.S. at 51, 124 S. Ct. at 1364. Rather, the circumstances indicate that an objective declarant would reasonably expect the State to make use of her statement: Aleasha memorialized Sanchez’s threat by writing it down on a piece of paper from a yellow legal pad; she used a formal salutation on the note: “[t]o whom it concerns:”; the note asserted that Sanchez had already committed a crime-threatening Aleasha; the note asserted that Sanchez contemplated a future crime-killing Aleasha; and she formally ended her note by both printing and signing her name. Additionally, though Aleasha did not “shove a written statement under the courthouse door,” she did leave the note in a location that an officer investigating her death could easily find it; the officer testified that he found the note on Aleasha’s kitchen counter with her bills and correspondence. Mizenko, ¶ 19. We conclude that Aleasha’s note was testimonial because the purpose of the note was to explain Aleasha’s untimely death or poisoning, the intended audience reasonably included law enforcement, and the circumstances surrounding the note *252 indicate that an objective declarant reasonably should have anticipated that the State would make use of the statements at trial. Our conclusion that Aleasha’s note was testimonial, however, does not end our analysis.[1]
¶39 Though the Supreme Court held in Crawford that the Confrontation Clause mandates cross-examination to assess a testimonial statement’s reliability, the Court nonetheless acknowledged that exceptions to the Confrontation Clause exist. Crawford, 541 U.S. at 62, 124 S. Ct. at 1370. The Court cited the forfeiture by wrongdoing doctrine as one such exception: “the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability.” Crawford, 541 U.S. at 62, 124 S. Ct. at 1370. In Davis, the Court again referenced the equitable doctrine, stating that “one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation.” Davis, 547 U.S. at 833, 126 S. Ct. at 2280.
¶40 As this case presents our first opportunity to consider the forfeiture by wrongdoing doctrine since the Crawford decision, other jurisdictions’ post-Crawford decisions aid our analysis. To the extent that it applies to an admitted and intentional killing, we find persuasive the Sixth Circuit’s reasoning in U.S. v. Garcia-Meza, 403 *253 F.3d 364 (6th Cir. 2005). In Garcia-Meza, a jury convicted the defendant of murdering his wife after hearing testimony from law enforcement officers describing the wife’s hearsay statements concerning a prior assault. At trial, the defendant admitted killing his wife, but argued that her murder was not premeditated. Garcia-Meza, 403 F.3d at 367. On appeal, Garcia-Meza claimed that his right to confrontation was violated when his wife’s hearsay statements were admitted into evidence. Garcia-Meza, 403 F.3d at 369. The Sixth Circuit disagreed and held that Garcia-Meza had forfeited his right to confrontation because his wrongdoing caused her unavailability. Garcia-Meza, 403 F.3d at 370 (citing Crawford, 541 U.S. at 62, 124 S. Ct. at 1370; Reynolds v. U.S., 98 U.S. 145, 158-59, 25 L. Ed. 244, 248 (1879) (“The rule has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong.”)). The Sixth Circuit noted that no dispute existed as to whether the defendant killed his wife; the dispute centered, rather, on whether the defendant acted with premeditation. Thus, the court reasoned, because the defendant was responsible for the declarant’s unavailability, he forfeited his right to confrontation. Garcia-Meza, 403 F.3d at 370.
¶41 The Sixth Circuit specifically rejected Garcia-Meza’s argument that the forfeiture doctrine applies only when the defendant has committed wrongdoing with the intent to prevent the witness from testifying. Garcia-Meza, 403 F.3d at 370. The court stated that the Supreme Court’s affirmation of the forfeiture doctrine’s equitable basis “strongly suggests that the rule’s applicability does not hinge on the wrongdoer’s motive.” Garcia-Meza, 403 F.3d at 370. The court further reasoned that a defendant would benefit if his wrongdoing prevented a witness from testifying against him, regardless of whether or not that was his intent. The Sixth Circuit held that the rule of forfeiture, based on equitable principles, permits no such result. Garcia-Meza, 403 F.3d at 370-71.
¶42 The Sixth Circuit decided Garcia-Meza in the interim between the United States Supreme Court’s Crawford and Davis decisions. In Davis, the Supreme Court further clarified the forfeiture by wrongdoing doctrine. In response to the contention that domestic violence cases require more flexibility regarding testimonial evidence, the Court reiterated that the doctrine operates to extinguish “confrontation claims on essentially equitable grounds.” Davis, 547 U.S. at 833, 126 S. Ct. at 2280 (citations omitted). The Court noted that domestic violence crimes are particularly prone to victim intimidation and coercion to prevent the victim from testifying, and it *254 stated that:
[W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they do have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system.
Davis, 547 U.S. at 831-34, 126 S. Ct. at 2279-80. The Court farther stated that Federal Rule of Evidence 804(b)(6) codifies the forfeiture doctrine. Though primarily dicta, the Davis discussion of the forfeiture doctrine and the Court’s statement that Rule 804(b)(6) “codifies” the doctrine has generally been interpreted by lower courts to require a defendant’s intent to silence a witness by wrongdoing before applying the doctrine. E.g. Colorado v. Moreno, 160 P.3d 242, 245-46 (Colo. 2007) (collecting cases and noting that “the clear consensus in non-murder cases is that the doctrine requires a showing of an intent on the part of the defendant to prevent the declarant from testifying at trial.”).
¶43 Though the Supreme Court’s discussion of the forfeiture doctrine in Davis seemingly casts doubt on the Sixth Circuit’s reasoning in Garcia-Meza, other jurisdictions’ post -Davis decisions concur with the Sixth Circuit that, in homicide cases, the doctrine’s applicability does not depend on whether the defendant intended to silence a witness. For example, in California v. Giles, a murder case, the California Supreme Court held that an “intent-to-silence” element is not a prerequisite to the forfeiture doctrine’s applicability. 152 P.3d 433,443 (Cal. 2007), cert. granted,_U.S._, 128 S.Ct. 976. The defendant in Giles admitted killing his girlfriend, but argued that he acted in self-defense. The California Supreme Court adopted its appellate court’s reasoning that “[fjorfeiture is a logical extension of the equitable principle that no person should benefit from his own wrongful acts.” Giles, 152 P.3d at 443. The court further reasoned that, regardless of whether a defendant specifically intended to prevent a witness from testifying, “[a] defendant whose intentional criminal act renders a witness unavailable for trial benefits from his crime if he can use the witness’s unavailability to exclude damaging hearsay statements by the witness that would otherwise be admissible.” Giles, 152 P.3d at 443.
¶44 The California Supreme Court rejected the defendant’s argument that language from Davis discussing the forfeiture doctrine-‘“when defendants seek to undermine the judicial process by procuring or *255 coercing silence from witnesses and victims”’-supported an intent-to-silence requirement. Giles, 152 P.3d at 443 n. 5 (quoting Davis, 547 U.S. at 833, 126 S. Ct. at 2280). Rather, the court stated that the Supreme Court simply was describing traditional witness tampering cases in a domestic violence context. Giles, 152 P.3d at 443 n. 5. The California court considered it more significant that the Supreme Court reaffirmed the forfeiture doctrine’s equitable nature and clarified that Crawford did not destroy a court’s ability to protect the integrity of its proceedings. Giles, 152 P.3d at 443 n. 5. The Giles court concluded that applying the forfeiture doctrine without an intent-to-silence requirement was proper to protect the integrity of a court’s proceeding: “courts should be able to further the truth-seeking function of the adversary process when necessary, allowing fact finders access to relevant evidence that the defendant caused not to be available through live testimony.” Giles, 152 P.3d at 444.
¶45 Even jurisdictions that impose an intent-to-silence requirement on the forfeiture by wrongdoing doctrine recognize that homicide cases may present an exception. For example, in Illinois v. Stechly, the Illinois Supreme Court left open the possibility of a homicide exception though it determined that the above-quoted language from Davis “strongly connotes a requirement of intent.” 870 N.E.2d 333, 350-53 (Ill. 2007) (plurality). The Stechly court declined to apply the forfeiture doctrine to a sexual abuse case, absent evidence showing that the defendant intended to prevent the witness from testifying, and noted that outside the context of murder cases, the authorities uniformly require proof of intent.[2] Stechly, 870 N.E.2d at 353 (plurality). The court distinguished the majority of cases, which hold that intent is irrelevant, as either predating Davis or as involving the defendant’s murdering the witness. Stechly, 870 N.E.2d at 351-52 (plurality). The Illinois court further noted that jurisdictions that did not impose an intent-to-silence requirement in murder cases feasibly were reconcilable with the general rule requiring intent. Summarizing the reasoning of those cases, the Illinois court stated that those jurisdictions essentially hold that:
[T]he prosecution need not prove that the defendant committed murder with the intent of procuring the victim’s absence. This is *256 consistent with presuming such intent when the wrongdoing at issue is murder. When a defendant commits murder, notwithstanding any protestation that he did not specifically intend to procure the victim’s inability to testify at a subsequent trial, he will nonetheless be sure that this would be a result of his actions. Murder is, in this sense, different from any other wrongdoing in which a defendant could engage with respect to a witness-more than a possibility, or a substantial likelihood, a defendant knows with absolute certainty that a murder victim will not be available to testify.
Stechly, 870 N.E.2d at 352-53 (plurality). Thus, the Illinois court left open the possibility that the intent to prevent a witness’s testimony could be “presumed” in the murder context, while otherwise requiring proof of intent. Stechly, 870 N.E.2d at 352-53 (plurality).
¶46 To the extent that a deliberate criminal act results in the victim’s death, we agree that the forfeiture by wrongdoing doctrine does not hinge on whether the defendant specifically intended to silence a witness. The doctrine derives from the maxim that no person should benefit from the person’s own wrongdoing. Reynolds v. U.S., 98 U.S. at 158-59, 25 L. Ed. at 248; Garcia-Meza, 403 F.3d at 370. The natural result of a deliberate killing is always that the victim is unavailable to testify; we agree with the Giles court that a defendant whose intentional criminal act results in a victim-declarant’s death benefits from the defendant’s wrongdoing if the defendant can use the death to exclude the victim-declarant’s otherwise admissible testimony, regardless of whether the defendant specifically intended to silence the victim-declarant. Giles, 152 P.3d at 443. Such a result undermines the judicial process and threatens the integrity of court proceedings, and though courts may not “vitiate constitutional guarantees when they have the effect of allowing the guilty to go free[,]” nor must they acquiesce in the destruction of the criminal-trial system’s integrity. Davis, 547 U.S. at 833, 126 S. Ct. at 2280.
¶47 The facts of this case are substantially similar to those of Garcia-Meza. Sanchez fatally shot Aleasha, thereby rendering her unavailable as a witness. Sanchez was charged with Aleasha’s homicide, and the State introduced her prior statements. No dispute exists as to whether Sanchez killed Aleasha-he admitted it to law enforcement and at trial. We need not determine whether the defendant’s wrongdoing is the same act for which he was tried because the dispute at trial centered on whether mitigating circumstances existed, not on whether Sanchez killed Aleasha. We conclude that *257 Sanchez forfeited his Sixth Amendment right to confront Aleasha when he killed her. Moreover, Sanchez cannot claim that his Montana constitutional right to “meet the witnesses against him face to face” was violated when his admittedly deliberate wrongdoing prevented such a confrontation. We emphasize the narrow holding on this issue: when a defendant admittedly and deliberately kills another person, thus procuring the person’s unavailability as a witness, the defendant forfeits the constitutional rights to confront the victim at trial.[3] Whether the doctrine of forfeiture by wrongdoing applies to situations in which the defendant disputes the underlying act of “wrongdoing” or to situations in which the wrongdoing does not result in death are issues not presented or addressed in this case.
¶48 Though the District Court failed to address Sanchez’s Confrontation Clause claim and based its ruling on hearsay exceptions, we cannot say the District Court reached an incorrect result. We will uphold a district court’s correct decision, regardless of the stated rationale. State v. Rensvold, 2006 MT 146, ¶ 34, 332 Mont. 392, ¶ 34, 139 P.3d 154, ¶ 34. We conclude the District Court reached the legally correct result.
¶49 III. Did the prosecutor’s closing argument deny Sanchez the right to a fair trial?
¶50 Sanchez asserts that the prosecutor engaged in misconduct by repeatedly misstating the law regarding the elements of mitigated deliberate homicide during closing arguments and that these misstatements denied Sanchez his right to a fair trial. The State maintains that Sanchez has waived his right to appeal this issue because he failed to move the District Court for curative measures, such as a mistrial or a cautionary instruction. As Sanchez points out, however, his objection was overruled, and he had no reason to anticipate that the District Court would issue curative measures. We conclude that Sanchez’s objection during closing arguments properly preserved this issue for appeal. Section 46-20-104, MCA.
¶51 If a prosecutor’s improper comments prejudice a defendant’s right to a fair trial, then the proper remedy is reversal. State v. Stringer, 271 *258 Mont. 367, 381, 897 P.2d 1063, 1072 (1995). Though Sanchez did not move the District Court for a mistrial based on prosecutorial misconduct, we employ the same two-step analysis we use to review a denial of such a motion: we determine first whether the prosecutor made improper comments, and, if so, whether the comments prejudiced the defendant’s right to a fair and impartial trial. State v. Gladue, 1999 MT 1, ¶ 12, 293 Mont. 1, ¶ 12, 972 P.2d 827, ¶ 12.

A. The prosecutor’s comments during closing argument

¶52 Sanchez argues that the prosecutor repeatedly misstated the law regarding mitigated deliberate homicide during the State’s closing argument and rebuttal. Specifically, Sanchez points to the prosecutor’s statement that, to convict for mitigated deliberate homicide, the jury had to find that Sanchez’s response to extreme emotional distress was reasonable, rather than that a reasonable explanation existed for his emotional distress. The prosecutor then argued:
[t]he streets would be littered with corpses if it was reasonable to shoot somebody because they cheated on you and made you angry. Based on your own lifetime experiences you have seen that. You may have been part of it. Did you kill somebody? Did somebody kill you, your friends, other people? No. That answers the question. This is not a reasonable response for a person under these circumstances.
(Emphasis added.) Sanchez argues that the plain language of the mitigated deliberate homicide statute indicates that “reasonable” modifies the defendant’s emotional state, not the defendant’s actions. The statute provides that a person who commits a deliberate homicide, “but does so under the influence of extreme mental or emotional stress for which there is reasonable explanation or excuse” has committed mitigated deliberate homicide. Section 45-5-103(1), MCA. The statute is unambiguous, and we conclude that the prosecutor misstated the law.
¶53 On appeal, the State argues that the prosecutor’s remarks are “troubling” only because they are not presented in their proper context. The State then attempts to furnish this context by directing us to two instances when the prosecutor made “accurate” statements of the law. The first instance the State identifies is an accurate statement of the law; however, the State has misidentified the speaker: it was Sanchez’s counsel, not the prosecutor who properly stated the law on mitigated deliberate homicide. The second instance, though properly attributed to the prosecutor and an accurate statement of the law, was followed directly by an incorrect explanation:
*259 The reasonableness of the explanation or excuse must be determined from the viewpoint of a reasonable person in the actor’s situation. That is, what would a reasonable person do, not what the defendant did. The evidence in this case shows you it was not reasonable. And if it’s not reasonable, there goes mitigated deliberate homicide.
(Emphasis added.)
¶54 The State maintains that improvising during closing arguments frequently results in imperfect syntax and less than crystal clear meaning. The comments at issue, however, demonstrate a blatant misstatement of the law, not mere inadvertence. The prosecutor’s improper closing argument went far beyond appropriate ad-libbing and tested the boundaries of professional ethics. We cannot accept the State’s incongruous arguments in support of the prosecutor’s statements, and we conclude that the prosecutor’s statements were improper.

B. Prejudicial effect of improper comments

¶55 Having determined that the prosecutor improperly stated the law, we must next determine whether the comments prejudiced Sanchez’s right to a fair and impartial trial. Gladue, ¶ 12. We do not presume that a prosecutor’s improper comments prejudiced a defendant’s right to a fair and impartial trial; rather, Sanchez must demonstrate, from the record, that the prosecutor’s misstatements prejudiced him. Gladue, ¶ 27. Additionally, when determining prejudicial effect, we review improper comments in the context of the entire case. Gladue, ¶ 27.
¶56 Sanchez offers as evidence of prejudicial effect a note from the jury to the District Court requesting additional instructions. The note reads: “Your Honor, One of our jurors has requested that you define the term ‘reasonable.’” Sanchez argues that the jury’s note indicates that the jury was confused by the term “reasonable,” that the prosecutor’s improper comments caused this confusion, and that Sanchez’s right to a fair trial was thus prejudiced.
¶57 The jury’s note requested only that the District Court define “reasonable.” The note did not indicate that the jury was confused as to which term “reasonable” modified. Moreover, the jury instruction on mitigated deliberate homicide accurately conveyed § 45-5-103, MCA, which unambiguously states that “reasonable” modifies the explanation for the extreme mental or emotional stress, not the defendant’s act of causing the death of another human being. The jury additionally was presented with defense counsel’s correct *260 interpretation of the law and the District Court’s instructions on mitigated deliberate homicide. The prosecutor also informed the jury that the attorneys’ closing arguments were not evidence. Before closing arguments the District Court read aloud the jury instructions and stated that the instructions “constituted] the law that [the jury] must follow in this case.” American jurisprudence depends on a jury’s ability to follow instructions and juries are presumed to follow the law that courts provide. State v. Turner, 262 Mont. 39, 55, 864 P.2d 235, 245 (1993); Opper v. U.S., 348 U.S. 84, 95, 75 S. Ct. 158, 165 (1954).
¶58 Based on the lack of ambiguity in the mitigated deliberate homicide instruction, the District Court’s oral and written instructions to the jury, and the presumption that the jury followed the law, we conclude that Sanchez has failed to demonstrate that the prosecutor’s improper comments prejudiced his right to a fair and impartial trial.
¶59 IV. Did the “lesser included offense” language of the mitigated deliberate homicide instruction impermissibly allow the jury to consider sentencing in reaching its verdict?
¶60 Sanchez claims that the jury instruction defining mitigated deliberate homicide as a “lesser included offense of Deliberate Homicide” improperly allowed the jury to consider sentencing in reaching its verdict. Sanchez asserts that this language “probably pushed the jurors away from fully considering [his] mitigated deliberate homicide defense.” (Emphasis added.) Sanchez argues that including the word “lesser” in the instruction may have permitted the jury to surmise that Sanchez would receive a lesser sentence if the jury convicted him of mitigated deliberate homicide rather than of deliberate homicide.
¶61 A jury should not consider sentencing in determining a defendant’s guilt or innocence. State v. Brodniak, 221 Mont. 212, 226-27, 718 P.2d 322, 332 (1986) (citations omitted). We recognized in Brodniak that a verdict form containing the terms misdemeanor and felony could permit a jury indirectly to consider a defendant’s punishment. Brodniak, 221 Mont. at 226-27, 718 P.2d at 332. We review jury instructions in criminal cases in their entirety to determine if they fully and fairly presented the applicable law to the jury. State v. Detonancour, 2001 MT 213, ¶ 57, 306 Mont. 389, ¶ 57, 34 P.3d 487, ¶ 57. District courts have broad discretion when instructing juries, and reversible error occurs only if the jury instructions prejudiced the defendant’s substantial rights. State v. Strauss, 2003 MT 195, ¶ 47, 317 Mont. 1, ¶ 47, 74 P.3d 1052, ¶ 47.
¶62 The District Court provided the jury a mitigated deliberate *261 homicide instruction that closely parallels § 45-5-103, MCA, the statute defining mitigated deliberate homicide. The jury instruction correctly stated the law. Additionally, the jury instructions, taken together, accurately set forth the State’s burden of proof and the elements that the jury must find to convict Sanchez of mitigated deliberate homicide or deliberate homicide. To give a jury instruction on mitigated deliberate homicide that would alleviate Sanchez’s concern would be difficult, if not impossible. If, as Sanchez argues, use of the word “lesser” invited the jury to indirectly consider punishment, the same can be said of the word “mitigated”-a term defining the very essence of the described offense. The jury instructions, when viewed in their entirety, fully and fairly presented the applicable law to the jury. Moreover, Sanchez’s speculation that the “lesser included” language probably dissuaded the jury from a mitigated deliberate homicide verdict cannot overcome the presumption that the jury actually followed the law that the District Court provided. Turner, 262 Mont. at 55, 864 P.2d at 245. We conclude that the District Court properly instructed the jury.
¶63 Affirmed.
JUSTICE MORRIS concurs.

 In his concurrence, Justice Rice relies on State v. Spencer, 2007 MT 245, 339 Mont. 227, 169 P.3d 384, for the proposition that we should consider the “primary purpose” of Aleasha’s note itself to determine whether the note constitutes a testimonial statement. The concurrence misreads Spencer.
In Spencer, we determined that a three-and-a-half-year-old victim’s statements were non-testimonial after determining that the witnesses testifying about the statements had heard the statements in their capacities as a foster parent and a counselor, rather than as state investigators. Spencer, ¶ 23. Because the statements were made to non-governmental agents, the statements were presumed non-testimonial unless the declarant had “clear reason to believe” that they would be used against the defendant in court. Mizenko, ¶ 23. We concluded, however, that the “clear reason to believe” standard was unworkable when applied to a three-and-a-half-year-old victim and, relying on the United States Supreme Court’s Davis decision, we looked to the “primary purpose” of the interaction between the declarant and the witnesses because the circumstances surrounding the statements bore similarities to an interrogation. Spencer, ¶ 22.
Here, in contrast to Spencer, the declarant, Aleasha, was a competent adult and the circumstances bear no similarities to an interrogation. Even if the circumstances were akin to an interrogation, the proper focus would be on the primary purpose of the interrogation or interaction, not, as the concurrence suggests, on the primary purpose of the statement itself. Moreover, though we concluded in Spencer that the declarant’s age made the Mizenko presumptions unworkable, those presumptions were nonetheless initially implicated and necessitated the “primary purpose” analysis; no presumptions are implicated in this case. For these reasons, Spencer is not applicable to the present case.

 Recent holdings of the California Supreme Court in Giles and the Washington Supreme Court in Washington v. Mason, 162 P.3d 396 (Wash. 2007) challenge the Stechly plurality’s claim. Though both the California and Washington cases involved homicide cases, the courts’ holdings that the applicability of the forfeiture doctrine required no intent-to-silence were not limited to homicide cases.

 In his special concurrence, Justice Nelson concludes that the Court errs by adopting the reasoning of the California court in Giles. Lest anyone be confused, there is a difference between discussing an opinion from a sister state and “adopting” that court’s reasoning. We do not adopt Giles. Rather, our holding is heavily qualified: the wrongdoing must be deliberate, it must be criminal, and it must result in the victim/declarant’s death. Despite the concurrence’s protestations to the contrary, our holding does not amount to a “broad sweeping statement” as to the applicability of the forfeiture doctrine.